**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 13-cv-2504

JAMES DAHN,

       Plaintiff,

v.

ADOPTION ALLIANCE;
MELANIE TEM, individually and in her official capacity;
VICKI LITTLE, individually and in her official capacity;
AUDREY AMEDEI, individually and in her official capacity; and
AMANDA CRAMER, individually and in her official capacity;

       Defendants.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff, by and through his attorneys, Mari Newman, Darold W. Killmer, and Sarah M.

Morris of KILLMER LANE & NEWMAN, LLP and David Webster of THE LAW FIRM OF JARAY &

WEBSTER, LLC, respectfully alleges for his Complaint as follows:

**I. INTRODUCTION**

1.      This is a case about the real human cost of a calloused and uncaring adoption

system that refuses to protect the vulnerable children it is supposed to serve.  After placing James

Dahn in the home of a man who turned out to be a sadistic predator, Defendants actively blinded

themselves to mounting signs that James was being abused.  The social workers employed by

that broken adoption system recklessly disregarded multiple, repeated signs, surfacing over the

1

course of months, that young James was a victim of child abuse, and in so doing allowed that abuse to continue.

2.      This is an action for damages and other relief against Defendants Audrey Amedei and Amanda Cramer, both Moffat County Department of Social Services caseworkers, and Defendant Adoption Alliance and two of its agents, Melanie Tem and Vicki Little, for violating Plaintiff James Dahn's rights under the Fourteenth Amendment to the Constitution of the United States via outrageous, willful and wanton conduct.  Defendants violated James' Fourteenth Amendment rights via outrageous, willful, and wanton conduct when, intentionally, knowingly, recklessly, and with deliberate indifference to his constitutional rights they affirmatively chose to ignore and thus affirmatively greatly enhanced the danger to James Dahn from the abuse of his adoptive father Jeremiah Lovato, despite undeniable evidence of that abuse.  Defendants' shocking, outrageous actions and inactions caused James Dahn to be physically abused at the hands of his adoptive father for nearly two years before, as a fifteen-year-old child, he was left with no other recourse than to save *himself* by fleeing from Jeremiah Lovato's custody.

3.      Defendants' conduct was performed under color of state law and directly or proximately caused the deprivation of Plaintiff's federally protected rights.

## II. JURISDICTION AND VENUE

4.      Jurisdiction over these claims is conferred upon this Court pursuant to 28 U.S.C. § 1331 and § 1343(a)(3), and this case is brought pursuant to 42 U.S.C. § 1983.  This Court has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.  Jurisdiction supporting Plaintiff's claims for attorney fees is conferred by and brought pursuant to 42 U.S.C. § 1988.

5.      Venue is proper in the District of Colorado pursuant to 28 U.S.C. § 1391(b).  All of the events alleged herein occurred within the State of Colorado, and all of the Defendants were residents of the State of Colorado at all relevant times stated herein.

6.      Plaintiff has complied with the requirements of C.R.S. § 24-10-109, *et. seq.* by providing sufficient written notification to the applicable government entities within one hundred eighty days after the appointment of James Dahn's conservator.

## IV. PARTIES

7.      At all times relevant to this Complaint, Plaintiff James Dahn (f/k/a James Lovato) was a minor child, a citizen of the United States of America, and a resident of the State of Colorado for a majority of the salient events.  On February 8, 2012, Mark J. Hines was duly appointed as Plaintiff's Conservator by the District Court of El Paso County, Colorado, Case No. 11PR1288.

8.      At all times relevant to this Complaint, Defendant Audrey Amedei was a citizen of the United States of America and a resident of the State of Colorado and was acting under color of state law in her capacity as a Caseworker employed by the Moffat County Department of Social Services.

9.      At all times relevant to this Complaint, Defendant Amanda Cramer was a citizen of the United States of America and a resident of the State of Colorado and was acting under color of state law in her capacity as a Caseworker employed by the Moffat County Department of Social Services.

10.      At all times relevant to this Complaint, Defendant Melanie Tem was a citizen of the United States of America and a resident of the State of Colorado and was acting under color

3

of state law in her capacity as a Placement Supervisor employed by Defendant Adoption

Alliance.

11. At all times relevant to this Complaint, Defendant Vicki Little was a citizen of the

United States of America and a resident of the State of Colorado and was acting under color of

state law in her capacity as an Adoption Caseworker employed as an independent contractor by

Defendant Adoption Alliance.

12. Defendant Adoption Alliance was a Colorado nonprofit corporation that

voluntarily dissolved on or about March 31, 2012.

13. At all times relevant to the subject matter of this litigation, Defendant Adoption

Alliance and all of its agents and employees were acting under color of state law.

### V. FACTUAL ALLEGATIONS

**James Dahn's early life.**

14. James Dahn was born in 1994 in Oklahoma.

15. After suffering abuse from his biological parents, James Dahn was removed from

his biological home and was placed in the custody of the State of Oklahoma for much of his

young life.

16. Upon his removal from his natural family and involuntarily placement into

substitute care, James Dahn became a foster child entitled to the substantive due process

protections guaranteed to foster children by the Fourteenth Amendment to the United States

Constitution.

4

17.    James Dahn, the young child pictured below, had a right under the Fourteenth

Amendment to the United States Constitution not to be placed with a foster or adoptive parent

whom his caseworkers and supervisors knew or suspected was likely to abuse or neglect him.



18.    Between the ages of six and twelve, James Dahn lived in well over one dozen

different foster homes.

19.    By the time he reached his final foster home, James Dahn had undergone

treatment and therapy and was doing well.

**Defendants Adoption Alliance, Melanie Tem, and Vicki Little placed James Dahn in
physical danger and willfully ignored repeated signs that he was being abused.**

20.    At all times relevant to this Complaint, Defendant Adoption Alliance was a

private adoption agency licensed by the State of Colorado.

21.    Upon information and belief, Defendant Adoption Alliance contracted with the

State of Oklahoma and/or the State of Colorado to monitor, on behalf of the State of Oklahoma

and/or the State of Colorado, James Dahn's placement with Jeremiah Lovato until the adoption

was finalized.

5

22.     Pursuant to contracts with the State of Colorado, Defendant Adoption Alliance was responsible for (1) determining that the case packet submitted by the adoption placement agency in an interstate adoption subject to the Interstate Compact on the Placement of Children ("ICPC"), C.R.S. § 24-60-1801 *et seq.*, followed procedures related to ICPC adoptions as outlined in state rules, federal rules, statutes and the national AAICPC (Association of Administrators of the Interstate Compact on the Placement of Children); (2) reviewing complete sets of request packets for an adoptive placement from a Colorado sending agency or out-of-state ICPC office and then granting or denying permission for the placement to occur; and (3) establishing follow-up procedures to establish that requested/required post-placement services were being provided in the receiving state.

23.     Defendant Adoption Alliance was, at all times relevant to this Complaint, acting under color of state law.

24.     In 2006, Defendant Adoption Alliance affirmatively exercised the power given to it by the States of Colorado and/or Oklahoma and approved then-36-year-old machinist Jeremiah Lovato as a prospective adoptive parent.

25.     As part of the approval process, Defendant Adoption Alliance required Mr. Lovato to sign a discipline policy that stated that he would not use any kind of physical punishment on his adopted child.

26.     In 2007, a separate adoption agency matched as an adoptive parent-child pair James Dahn and Mr. Lovato, who had no biological relationship to James Dahn.

27.     Defendant Adoption Alliance made an investigation of the prospective match and ultimately issued a formal report approving it.  In the course of the "investigation," Defendant

6

Adoption Alliance determined that Mr. Lovato failed to disclose his criminal background, by omitting that in 1989 he pled guilty to one count of contributing to the delinquency of a minor. The investigation also revealed that Mr. Lovato's parents had subjected him to physical discipline.  With knowledge of Mr. Lovato's omission of his criminal history involving a child and his personal history with physical discipline, in October 2007 Defendant Adoption Alliance nevertheless approved of James Dahn's match with Mr. Lovato, again affirmatively exercising the power granted to it by the States of Colorado and/or Oklahoma.

28.     On January 3, 2008, then-13-year-old James Dahn arrived in Colorado and was placed in Jeremiah Lovato's physical custody.

29.     Upon James Dahn's placement with Mr. Lovato, he remained a foster child and would until his adoption by Mr. Lovato was finalized in December 2008.

30.     Upon James Dahn's placement with Mr. Lovato, Defendant Adoption Alliance assumed an affirmative duty to act to protect James Dahn from abuse in his adoptive placement.

31.     Defendant Adoption Alliance had a special relationship with James Dahn, arising from its assumption of the duty to monitor his welfare throughout and ultimately approve or disprove his prospective adoptive placement.

32.     Defendant Adoption Alliance owed James Dahn substantive due process protections under the Fourteenth Amendment, including James Dahn's right to be reasonably safe from harm in foster care, when it approved James Dahn's placement with Jeremiah Lovato and placed him involuntarily into Jeremiah Lovato's foster care, thereby restraining his ability to protect himself.

33.      Public officials—such as Defendants Adoption Alliance, Little, and Tem acting here—who approve and monitor a child in state custody in a foster or adoptive home where the child is at risk of violence or abuse from private individuals violate the child's Due Process rights as guaranteed by the Fourteenth Amendment.

34.      Under Colorado state law, C.R.S. § 19-5-206,  James Dahn's best interests should have been the primary objective in Defendant Adoption Alliance's, Little's, and Tem's placement of him with Jeremiah Lovato as an adoptive parent, and Defendant Adoption Alliance assumed the responsibility of monitoring James Dahn's environment to ensure it met his best interests, including his physical safety.

35.      Defendants Adoption Alliance, Little, and Tem failed to meet the above-mentioned obligations, which constituted a deprivation of James Dahn's substantive due process rights guaranteed under the Fourteenth Amendment.

36.      Defendants Adoption Alliance, Little and Tem knew or should have known that failing to perform the above-described affirmative duties put James Dahn at substantial risk of serious, immediate, and proximate harm.

37.      Defendant Vicki Little was the only caseworker that Defendant Adoption Alliance assigned to James Dahn's placement with Jeremiah Lovato.  She was required to make monthly post-placements visits with James Dahn and Jeremiah Lovato from the time of placement until the adoption was finalized, under the ICPC, C.R.S. § 24-60-1801 *et seq.*

38.      Defendant Tem was acting as Defendant Little's supervisor at all times relevant to this Complaint, including when Defendant Little made the above-mentioned investigations and reports.

8

39.     Soon after James Dahn's placement with Jeremiah Lovato the first signs of trouble began to arise.  In her April 19, 2008 report, Defendant Little noted that Jeremiah Lovato had represented that he could not afford to sign James Dahn up for a baseball team.

40.     Omitted from Defendant Little's report, however, is that, just as he was telling the caseworker that he could not afford baseball for his adopted son, Mr. Lovato was showing Defendant Little his brand-new red sports car.  Certainly the fact that Mr. Lovato was unwilling to spend a relatively small amount to allow James to participate in Little League baseball while treating himself to a new sports car should have alerted Ms. Little that something was not right.

41.     Defendant Tem reviewed and ratified Defendant Little's report and made the affirmative decision not to require further investigation.

42.     On May 31, 2008, Defendant Little made a home visit with James Dahn and Jeremiah Lovato.  Defendant observed a red mark on the side of James Dahn's eye and asked the two how it had happened.  Both attempted to laugh off the mark; their only explanation was that it resulted from mere wrestling around.

43.     As she was leaving, Defendant Little asked to speak to James Dahn in her car alone.  The child was defensive and anxious but stated that he loved his new father, which Defendant Little knew or should have known were all classic signs of an abusive relationship.

44.     James Dahn was so relieved to exit the car that Defendant Little observed so and noted it in her report.

45.     Jeremiah Lovato called Defendant Little twice in the moments thereafter.  He asserted that James Dahn was scared to be taken away from his new home.

46.    In the face of these signs of abuse, Defendant Little made the affirmative choice to ask no further questions and to make no further investigation.  Instead she affirmed to James Dahn that she believed the two were doing well together and he would not be taken away.

47.    Despite her knowledge that abused children are often fearful of disclosing abuse to strangers for fear of further abuse, Defendant Little affirmatively chose to turn a blind eye to the obvious danger that Jeremiah Lovato was abusing James.  In her report of the visit, she stated that she did not investigate the explanation for the bruise because she did not believe any abuse was occurring.  Had she been exercising her professional judgment, her report should have reflected that James Dahn's defensiveness was cause for concern.  Certainly, it justified follow-up investigation, which Defendant Little chose not to conduct.

48.    Instead, Defendant Little willfully, wantonly, deliberately and/or recklessly disregarded and turned a blind eye to signs of James Dahn's suspected child abuse and signed off on her monthly visit report.

49.    Defendant Little knew or should have known that failing to perform her affirmative duties to investigate child abuse and protect James Dahn put him at substantial risk of serious, immediate, and proximate harm.

50.    Defendant Tem reviewed and ratified Defendant Little's report and made the affirmative decision not to require further investigation.

51.    Jeremiah Lovato canceled Defendant Little's next two scheduled monthly visits, in June and July, the day before each was scheduled to occur.

52.    Instead of insisting on in-person visits with the child who had visible injuries during her last visit, Defendant Little allowed the cancellations.

53.    Rather than observing James in person, Defendant Little spoke to James Dahn briefly on the phone in June.

54.    Astoundingly, Defendant Little made the affirmative decision to neither meet—nor even have a phone conversation with—James in July.

55.    Defendant Little affirmatively chose not to take further action to investigate the last-minute cancellations of her visits with the child she last saw two months before with visible bruising on his face.

56.    By affirmatively accepting Jeremiah Lovato's cancelled appointments without question, Defendant Little derogated from her legal duty to have monthly face visits, failed to exercise her professional judgment, and willfully, wantonly, deliberately and/or recklessly disregarded yet another sign of the suspected child abuse of James Dahn.

57.    It was only on August 2, 2008 that Defendant Little finally visited James Dahn and Jeremiah Lovato.  In her report from the visit, she documented Mr. Lovato's desire to finalize the adoption quickly as well as James Dahn's loss of his "baby fat."

58.    Defendant Little's August report significantly understates James' dramatic weight loss.  By the time the school year started just one month later, James Dahn had lost over 25 pounds—hardly a normal occurrence for a growing teenage boy.  Indeed, James was being starved.

59.    Again, Defendant Little failed to exercise her professional judgment and willfully, wantonly, deliberately and/or recklessly disregarded signs of James Dahn's suspected child abuse and signed off on her monthly report without performing or recommending additional investigation.

60.     Again, Defendant Tem reviewed and ratified Defendant Little's report and made the affirmative decision not to require further investigation.

**Defendants Audrey Amedei and Amanda Cramer placed James Dahn in physical danger and willfully ignored repeated signs that he was being abused.**

61.     When James Dahn's eighth-grade school year began in September 2008, he missed the first two weeks of school.

62.     When James Dahn finally returned to school on or about September 16, 2008, he arrived at school with the remnants of a black eye and the aforementioned 25-pound weight loss.

63.     The signs of child abuse were obvious to school officials, who immediately reported suspected child abuse to  Moffat County Department of Social Services ("MCDSS").

64.     Under Colorado state law, C.R.S. § 19-3-308(1)(a), MCDSS had an affirmative duty to respond immediately upon receipt of any report of a known or suspected incident of intrafamilial abuse or neglect to assess the abuse involved and the appropriate response to the report.

65.     Under Colorado state law, C.R.S. § 19-3-308(3)(a), MCDSS had an affirmative duty to conduct an interview with or observance of the child who was the subject of a report of abuse or neglect.

66.     Under the Fourteenth Amendment to the United States Constitution, MCDSS owed James Dahn substantive due process protections not to create a danger that would result in harm to him by a private party.

67.     On or about September 16, 2008, Defendants Audrey Amedei and Amanda Cramer, as caseworkers for MCDSS, were serving an investigative function with regard to the reports of suspect child abuse of James Dahn.

12

68.     MCDSS and its caseworkers knew, or should have known, that school officials from Craig Middle School had repeatedly reported the suspected child abuse of James Dahn and that the failure to investigate the referrals carried a substantial risk of leading to a deprivation of James Dahn's constitutional rights.

69.     Defendants Audrey Amedei and Amanda Cramer knew or should have known that failing to perform their affirmative duties to investigate child abuse and protect James Dahn put him at substantial risk of serious, immediate, and proximate harm.

70.     Defendant Amedei was a seasoned professional with over sixteen years' experience.

71.     Defendant Cramer had participated in over thirty investigations prior to James Dahn's.

72.     Both Defendants Amedei and Cramer had the experience and knowledge to allow them to save young James Dahn, yet they willfully ignored the growing evidence of abuse.

73.     Defendants Amedei and Cramer also had the power and responsibility to investigate these overwhelming allegations of abuse, and had the power and responsibility to effect James Dahn's removal from Jeremiah Lovato's custody, yet repeatedly, willfully failed to do so.

74.     On September 17, 2008, Defendants Cramer and Amedei were assigned to respond to the report of suspected abuse and held a meeting with James Dahn and his school counselor.

13

75.     At the meeting, Defendants Cramer and Amedei observed James Dahn's black eye, yet chose not to photograph it (or ask anyone else to photograph it), affirmatively allowing this evidence of physical abuse to be lost.

76.     Defendants Amedei's and Cramer's report documented that James Dahn was withdrawn and so far in denial that he refused to even admit that he had a black eye.

77.     James Dahn later complained to the school counselor about having to meet with MCDSS, who conveyed those complaints to MCDSS.   The school counselor also observed that between seventh and eighth grade, James had grown increasingly withdrawn and defensive.

78.     On September 22, 2008, six days after the report of child abuse, Defendant Amedei and/or Defendant Cramer telephoned Jeremiah Lovato.

79.     Jeremiah Lovato refused to see the caseworkers in person, stating that he was too busy to do so.  Just as James had, Jeremiah Lovato also denied the black eye entirely.

80.     Astoundingly, despite acknowledging that Jeremiah Lovato "did not seem very credible but was very smooth," Defendants Amedei and Cramer made the affirmative decision to close their report by determining "no further safety action [wa]s necessary" and deeming the report of abuse "unfounded."

81.     In so doing, Defendants Amedei and Cramer illegally and/or inappropriately dismissed credible and repeated reports and warnings made by James Dahn's teachers and school officials—that they had themselves witnessed—that James Dahn was being abused, willfully, wantonly, deliberately and/or recklessly disregarding signs of James Dahn's suspected child abuse.

82.     On September 24, 2008, MCDSS received a second official report of suspected child abuse from James Dahn's school, barely a week after the last report.  After the bruise on his eye the prior week, James Dahn arrived at school with additional bruises on his right bicep and right forearm, so serious that they were noticed by school personnel.

83.     Defendant Cramer was assigned to respond to this report of abuse, but instead of taking the most basic steps to investigate these additional credible reports of physical abuse, she made the affirmative decision not to speak to James or his adoptive father, in derogation of her duty to conduct an interview with or observance of the child who was the subject of a report of abuse or neglect.

84.     Defendant Cramer's report of her response stated that (1) she confirmed with the school health technician that James Dahn had not grown an inch in height since January of 2008, but had lost 28 pounds of weight; (2) James Dahn attempted to explain away his weight loss by stating that he had forgotten to make dinner and there was no food in the house for dinner; (3) James Dahn's teachers characterized Jeremiah Lovato as "creepy" and "kn[owing] all the answers"; and (4) by this point in time, MCDSS had received several emails from teachers concerned for the child.

85.      At no point did Defendant Cramer photograph James Dahn (or ask anyone else to photograph him), affirmatively allowing the loss of evidence of his additional physical injuries.

86.     Defendant Cramer and Amedei thus illegally and/or inappropriately dismissed reports and warnings made by James Dahn's teachers and school officials that James Dahn was in danger and willfully, wantonly, deliberately and/or recklessly disregarded signs that James Dahn was a victim of child abuse.

**Defendants Adoption Alliance, Vicki Little, and Melanie Tem continued to willfully ignore repeated signs that James Dahn was being abused.**

87.    At the same time, Defendants Adoption Alliance, Vicki Little, and Melanie Tem also made the affirmative decision to turn a blind eye to the signs of abuse and to abandon James Dahn to the sadistic treatment being inflicted upon him by Jeremiah Lovato.

88.    On September 19, 2008, Jeremiah Lovato yet again cancelled a home visit with Defendant Little the day before it was scheduled.

89.    Defendant Little yet again accepted the cancellation without question and rescheduled the visit for September 28, 2008.

90.    On September 25, 2008, Defendant Little received a call from either Defendant Cramer and another MCDSS employee making her aware of the reports of suspected abuse, specifically the two reports within about a week from officials at James Dahn's school concerned about bruises, a black eye, and a twenty-eight-pound weight loss, as well as James Dahn's denials that anything was wrong.

91.    On September 28, 2008, Defendant Little made a home visit with James Dahn and Jeremiah Lovato.

92.    Defendant Little arrived at James Dahn's home earlier than she was expected.

93.    When Defendant Little arrived, Jeremiah Lovato was in the shower and Defendant Little had the unexpected opportunity to meet with James Dahn alone for a few minutes.

94.    As Defendant Little documented in her report of the visit, James Dahn attempted to shirk Defendant Little's questions and apparently desired not to talk to her. James Dahn made an excuse to leave the room and returned with Jeremiah Lovato.

16

95.     Defendant Little's report documented that she mentioned MCDSS's reports of suspected abuse to Jeremiah Lovato, but emphasized James Dahn's truancy.  The report documented Jeremiah Lovato's anxiousness to finalize the adoption as soon as possible and his worry that MCDSS's involvement would slow the adoption.

96.     During the visit, Defendant Little learned that Jeremiah Lovato had broken Defendant Adoption Alliance policy by leaving James Dahn with Jeremiah's brother overnight, in violation of Defendant Adoption Alliance's policy prohibiting overnight stays with anyone who does not have a background check on file with the organization.

97.     As before, Defendant Little chose to do nothing but remind Jeremiah Lovato of the policy, despite this additional suggestion that Jeremiah Lovato was flouting Defendant Adoption Alliance policy and was reckless with regard to James Dahn's safety.

98.     Defendant Little thus illegally and/or inappropriately dismissed reports and warnings made by James Dahn's school officials that James was in danger, failed to exercise her professional judgment, and willfully, wantonly, deliberately and/or recklessly disregarded multiple signs that James Dahn was a victim of child abuse.

99.     Again, Defendant Tem reviewed and ratified Defendant Little's report and made the affirmative decision not to require further investigation.

100.    In the weeks following this visit, Defendant Little met with officials from James Dahn's school.  Rather than discharge her duty to protect James Dahn, however, Defendant Little counseled the officials that they were overreacting, affirmatively removing what had been the only safety valves and cutting off sources of aid to James Dahn.

17

101.    Defendant Little's actions and inactions evinced her continued deliberate indifference to undeniable evidence of abuse, illegally and/or inappropriately dismissing reports and warnings made by James Dahn's school officials that James was in danger.

102.    On October 18, 2008, Defendant Little made a home visit with James Dahn and Jeremiah Lovato.

103.    On the visit, Defendant Little made no effort to speak to James Dahn independently and made the affirmative decision not to follow-up on the prior month's social services concerns.

104.    Her decision not to interview James Dahn by himself amounts to a failure of professional judgment, as any reasonable official in her position knew or should have known that it was a virtual impossibility that James would report his abuse while in the company of his abuser.

105.    Yet again, Defendant Tem reviewed and ratified Defendant Little's report and made the affirmative decision not to require further investigation.

106.    On November 22, 2008, Defendant Little made her final home visit with James Dahn and Jeremiah Lovato before the adoption was finalized.

107.    Defendant Little once again failed to exercise professional judgment by affirmatively choosing not to speak to James Dahn independently, before sealing his fate.

108.    Despite months of repeated signs of physical abuse, Defendant Little's report documents that the pair was doing well together, yet observes and attributes no significance to Jeremiah Lovato's impatience at the speed of the adoption and his desire to finalize it as soon as possible.

18

109.    Knowing of repeated, aggravating signs of child abuse, on or about November 27, 2008, Defendant Little performed a home study addendum.  In the addendum, Defendant Little specifically approved James' adoption by—and thus abandoned James Dahn to the sadistic abuse of—Jeremiah Lovato.

110.    Defendant Tem reviewed and ratified Defendant Little's report and made the affirmative decision not to require further investigation.

**Defendants Amedei and Cramer Affirmatively chose not to protect James Dahn despite reports of signs of abuse from his school and the concern of law enforcement**

111.    On December 1, 2008, Craig Police Officer Dale Secules responded to James Dahn's school after a call that James had yet another bruise on his eye.

112.    Secules telephoned Jeremiah Lovato, who responded angrily and would not permit the officer to speak with James Dahn.

113.    Officer Secules was concerned for James Dahn's safety and immediately went to Defendant Amedei with his concerns, questioning why she had not responded herself to this alarming situation.

114.    Rather than taking action to protect James Dahn, and knowing of law enforcement's concern for the child, Defendant Amedei responded defensively to Officer Secules, questioning his jurisdiction to respond to this call at all while simultaneously adamantly choosing not to take any action herself.

115.    Without explanation or any additional effort, Defendant Amedei merely stated that Jeremiah Lovato's refusal to let law enforcement speak with the minor child implied that he would also refuse to permit MCDSS to speak with him.

19

116.   Other than berating Officer Secules for his concerns about an abused child, Defendant Amedei made the affirmative decision to take no further action with respect to this report.

117.   Defendant Amedei affirmatively chose not to interview James Dahn or anyone else, to take photographs (or ask anyone else to do so) of James Dahn's injuries, or take any further action at all to protect James Dahn.

118.   Despite their affirmative obligation to protect young James, neither Defendant Amedei nor Defendant Cramer met with James Dahn pursuant to this report—thus derogating from their duty to conduct an interview with or observance of the vulnerable child who is the subject of a report of abuse or neglect, and willfully, wantonly, deliberately and/or recklessly disregarding signs that James Dahn was a victim of child abuse.

**Despite repeated and overwhelming signs of abuse, Defendants Adoption Alliance, Tem, and Little finalized James' adoption, sealing his fate.**

119.   On December 11, 2008, Jeremiah Lovato's adoption of James Dahn was finalized.

120.   Defendant Adoption Alliance signed off on James Dahn's adoption in December 2008, fully aware of the information in Defendant Little's reports and in the reports from MCDSS.

121.   Defendant Adoption Alliance had the power—and the obligation—to stop the adoption, but never did.  Defendant Adoption Alliance and its agents abandoned James Dahn to the custody of a sadistic criminal, derogating from their duty to protect him.

20

**Defendants Amedei and Cramer affirmatively ignored mounting evidence of abuse, including an additional report of suspected abuse from James' school.**

122.    On February 27, 2009, MCDSS received a fourth official report of suspected abuse from James Dahn's school.  Defendants Amedei and Cramer were assigned to investigate this report.

123.    The report was prompted by James Dahn missing six days in a row of school, and 24 out of 102 total days that school year alone.

124.    In response to the absences, the Craig Police School Resource Officer had gone to the Lovato home, but had not been able to contact anyone there.

125.    Almost immediately after the officer's visit, Jeremiah Lovato phoned the school to report that James Dahn was still ill.

126.    As documented in Defendant Amedei's MCDSS report, the school was "very concerned about [James Dahn]."

127.    Despite the urgency of the reports, Defendants Amedei and Cramer waited four days to attempt to see James Dahn.  Their delay violated their duty under Colorado state law to respond immediately upon receipt of any report of a known or suspected incident of intrafamilial abuse or neglect to assess the abuse involved and the appropriate response to the report.

128.    On March 3, 2009, four days after the report, Defendants Amedei and Cramer arrived at Jeremiah Lovato's home with the intention to confirm that James Dahn was sick as Jeremiah Lovato stated and close out the investigation paperwork.

129.    Defendants Amedei and Cramer affirmatively opted against performing an in-depth interview with James Dahn, despite acknowledging that James Dahn's situation was

21

serious enough to require that they strategize ahead of time such that only Defendant Cramer approached the door first while Defendant Amedei stood guard to watch for safety.

130. When Mr. Lovato answered the door, he was angry and refused to allow access to his home for over an hour.

131. When Mr. Lovato permitted Defendants Amedei and Cramer into his home, the two talked to James Dahn only momentarily, viewing him from only the neck up, never outside of Jeremiah Lovato's presence.

132. During the visit, James Dahn made very little eye contact with Defendants Amedei and Cramer and was trying to avoid discussion, which they observed and documented in their report of the visit. Defendants Amedei and Cramer made the affirmative decision to turn a blind eye to these obvious signs that something was wrong.

133. Defendants Amedei and Cramer chose not to interview James Dahn alone.

134. Defendant Amedei's and Cramer's decisions ran contrary to reasonable practice standards of interviewing children alone without their parents present, particularly in cases of suspected abuse.

135. Defendants Amedei and Cramer chose not to ask James Dahn to stand up or to inspect his body.

136. In leaving after this—at best—cursory investigation, Defendants Cramer and Amedei affirmatively chose not to heed the numerous warning signs that James Dahn desperately needed their help, and willfully, wantonly, deliberately and/or recklessly disregarded signs that James Dahn was the victim of child abuse.

**Defendants Amedei and Cramer falsely reported that there were "no safety concerns" even after James' abuser withdrew him from school—ending James' contact with the people who had tried to protect him from abuse.**

137.    On March 6, 2009, Jeremiah Lovato canceled a meeting with school officials and withdrew James Dahn to home schooling.

138.    Having withdrawn James from school, Jeremiah Lovato thus removed James' contact with the only people who had done anything at all to try to protect him from abuse—the school officials.

139.    Defendants Amedei and Cramer were aware of Jeremiah Lovato's withdrawal of his adopted son to home schooling, but each chose not to even once interview anyone else on the matter, return to the Lovato home, or to make any further investigation whatsoever.

140.    Defendants Amedei's and Cramer's report of their March 3, 2009 visit, finalized on March 16, 2009, observed only that it probably is not possible for MCDSS to have additional interaction or interviews with James Dahn or his adoptive father as a result of the home schooling.  They had washed their hands of him completely.

141.    Contrary to the multiple and alarming facts in front of them, as outlined above, Defendants Cramer and Amedei stated that "no safety concerns were identified" and deemed the report of February 2009 report of suspected abuse "unfounded."

142.    Defendant Amedei and Cramer thus abandoned James Dahn to the danger of abuse that they had created and enhanced.

143.    Throughout their involvement in James Dahn's case, Defendants Amedei and Cramer affirmatively and repeatedly chose not to effect the temporary removal power granted to them under C.R.S. § 19-3-405.

23

**Defendants' deliberate decisions not to protect James allowed James to be brutally and horribly abused.**

144. Encouraged and emboldened by those who abdicated their duty to protect James Dahn, Jeremiah Lovato continued to inflict brutal, increasingly severe abuse on James Dahn.

145. Jeremiah Lovato's abuse escalated to daily beating James Dahn, multiple times per day, with items such as his fists, rolling pins, and a meat tenderizer.

146. Eventually, Jeremiah Lovato began beating James Dahn with a piece of lumber, usually with James Dahn's clothes off, with as much strength as he could.

147. Jeremiah Lovato would flip over the wounded child with his foot, and then stomp on his testicles.

148. Jeremiah Lovato would force the child to clean up his own blood and further abuse him if he did not.

149. Jeremiah Lovato's abuse stopped only when 15-year-old James Dahn saved himself by fleeing from Jeremiah's custody on January 3, 2010.

150. Upon his escape, James Dahn was taken immediately to the hospital to treat the horrific injuries that Jeremiah Lovato had inflicted on him. James had been choked, sometimes with clothes hangers, and beaten on his head and buttocks daily, multiples time per day, face-down and naked, first with fists, later with a meat tenderizer, later still with a belt, and finally with a piece of lumber.

151. The brutal beatings resulted in open lesions, leaving scabbing, purulent pus, and whole chunks of tissue missing from his buttocks.

152. James had a broken right arm and bruising on his back, face, and ear. His doctors diagnosed the broken right arm as being a months-old injury, "classic for a night-stick fracture

24

from direct trauma, by putting his arm up to protect himself and being hit on the distal ulna." In
addition to his broken bones and bruising, James's testicles had been stomped on and his doctors
feared he might never be able to sit without pain.

153.    James's multiple physical injuries were memorialized by photographs taken by
Colorado Springs Department of Human Services caseworker Denine Cheney as follows:






Due to its graphic
nature, this
picture will be filed
under
Level One Restricted
Access
as Exhibit 1

154.    Upon his escape, James Dahn had a constant wound on his buttocks for 3 to 4 months, which at first grew larger and larger.  To this day, James Dahn still has scars on his head and buttocks.

155.    When law enforcement officers entered the Lovato home to investigate, they encountered a wooden dowel and a pressure-treated fencing baluster post "stained red with an unknown substance":



156.    In addition to the horrific physical abuse, Defendants' multiple failures also allowed Jeremiah Lovato to subject James to prolonged and damaging psychological abuse.

157.    The depth of Jeremiah Lovato's psychological abuse is revealed by the written litanies that he forced James Dahn to write, which detailed James's duties and pledges "to be a better son," and were also found in the home.

158.    Jeremiah Lovato was so depraved that he forced young James Dahn to write the following: "My entire life I have been living in a fantasy dream world.  I do not have to do anything.  I just do whatever I want and everything is handed to me on a silver platter with diamonds and a cherry on top of it.  All I ever had to do was play videogames and with toys and maybe take out the trash or clean a few dishes and eat sleep and poop.  And let someone wipe my butt for me.  And think for me, make choices for me.  People had to do everything for me…."

### Defendants have not been held accountable for their deliberate decisions not to protect young James

159.    Jeremiah Lovato was criminally charged and tried in January 2010 with the abuse he inflicted on young James Dahn.

27

160.    When asked at Jeremiah Lovato's criminal trial why she chose not to seek James Dahn out alone on more than one occasion, Defendant Little replied, only, "I don't know." Her words speak for themselves.

161.    Defendants Amedei and Cramer testified at Jeremiah Lovato's criminal trial, where they affirmed the paucity of their efforts to protect James Dahn under oath.

162.    James Dahn also testified and stated that he might have confided in Defendant Little, but never had the opportunity because his adoptive father was always present when she visited.

163.    James Dahn also testified that, throughout his time with Jeremiah Lovato, he feared for his life and did not trust the system to help him.

164.    In February 2010, Jeremiah Lovato was criminally convicted of 17 criminal counts and sentenced to 119 ½ years to life in prison.

165.    Defendants Adoption Alliance, Little, Tem, Cramer, and Amedei have yet to be held accountable for allowing the abuse of young James Dahn to take place and to continue because of their willful, wanton and deliberate decisions not to protect James, despite the repeated evidence of abuse.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**(§ 1983 – 14th Amendment Substantive Due Process Violation – Special Relationship Liability)**
**(Against Defendants Adoption Alliance, Little, and Tem)**

166.    James Dahn hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

167.    Defendants Adoption Alliance, Tem, and Little, at all relevant times hereto, were acting under the color of state law.

168.    At all relevant times to this Complaint, James Dahn had a clearly established constitutional right under the Fourteenth Amendment to the United States Constitution not to be deprived of his liberty without due process of law, which encompassed his right to be reasonably safe from harm in foster care.

169.    Any reasonable caseworker or supervisor knew or should have known of this clearly established right at all times relevant to this Complaint.

170.    Defendant Adoption Alliance's, Tem's, and Little's actions and inactions, as described herein, deprived James Dahn of his constitutional right to be free from deprivations of liberty without due process of law.

171.    James Dahn had a special relationship with Defendant Adoption Alliance and its agents, including Defendants Tem and Little, in that he was in their legal custody and the physical custody of Jeremiah Lovato.  That special relationship triggered an affirmative duty to protect James Dahn on the part of Defendant Adoption Alliance and its agents, including Defendants Little and Tem.

172.    Defendants Adoption Alliance, Little, and Tem breached their affirmative duty to protect James Dahn by placing and keeping him in the custody of Jeremiah Lovato in such a way that demonstrates an affirmative decision to turn a blind eye to the obvious signs of abuse and a failure of professional judgment, which caused James Dahn severe physical and mental harm from Jeremiah Lovato.

29

173.    Defendants Adoption Alliance, Little, and Tem affirmative decided to turn a blind eye to the obvious signs of abuse and failed to exercise professional judgment by their actions described above, including but not limited to only once speaking to James Dahn without Jeremiah Lovato present (before the worst of the abuse reports surfaced); by refusing to credit or investigate repeated reports from school officials that James was being abused, including a 25-pound weight loss and numerous bruises and MCDSS's multiple reports of potential abuse; by refusing to follow-up on those school reports of suspected abuse; by breaching their statutory duty to make monthly in-person visits. These actions or inactions, substantially departing from accepted professional judgment, practice or standards and created the conditions that allowed for the abuse of James Dahn.

174.    Defendants' conduct, as described herein, when viewed in total, shocks the conscience.

175.    Defendants Adoption Alliance, Little, and Tem engaged in the actions described herein intentionally, willfully, and wantonly.

176.    The acts and omissions of Defendants Little and Tem were engaged in pursuant to the custom, policy, and practice of Defendant Adoption Alliance, which failed to supervise, train, or discipline regarding its agents' evaluation, monitoring, and investigation of prospective adoptive placements for abuse.

177.    The acts and omissions of Defendants Adoption Alliance, Tem, and Little caused James Dahn damages in that he suffered and continues to suffer extreme physical and mental pain because of the months that Defendants deprived him of his substantive due process rights

and created the conditions that allowed his adoptive father's violent abuse of him to continue and worsen.

178.     Defendants' acts or omissions were the legal and proximate cause of James Dahn's damages.

## SECOND CLAIM FOR RELIEF
### (§ 1983 – 14th Amendment Substantive Due Process Violation – State-Created Danger Liability)
### (Against All Defendants)

179.     James Dahn hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

180.     Defendants Amedei and Cramer, at all relevant times hereto, were acting under the color of state law in their capacities as MCDSS Caseworkers.

181.     Defendants Tem and Little, at all relevant times hereto, were acting under the color of state law in their capacities as Defendant Adoption Alliance Placement Supervisor and Adoption Caseworker.

182.     Defendant Adoption Alliance, at all relevant times hereto, was acting under the color of state law in that: (1) the State had delegated to Defendant Adoption Alliance a function traditionally exclusively reserved to the States; (2) the deprivation of James Dahn's constitutional rights was caused by a rule of conduct imposed by the State or by persons for whom the State was responsible, in this case Defendants Tem, Little, Amedei and Cramer; (3) the State exercised coercive power or has provided such significant encouragement, either overt or covert, that Defendant Adoption Alliance's actions described herein must in law be deemed to be that of the State; and (4) the State so far insinuated itself into a position of interdependence

31

with Defendant Adoption Alliance that it must be recognized as a joint participant in the deprivation of James Dahn's constitutional rights described herein.

183.    At all relevant times to this Complaint, James Dahn had a clearly established constitutional right under the Fourteenth Amendment to the United States Constitution not to be deprived of liberty without due process of law, which encompassed his right to be reasonably safe from harm in foster care.

184.    Any reasonable caseworker or supervisor knew or should have known of this clearly established right at all times relevant to this Complaint.

185.    Defendants' actions and inactions, as described herein, deprived James Dahn of his right not to be deprived of liberty without due process of law, which encompassed his right to be reasonably safe from harm in foster care.

186.    Defendants' actions and inactions, as described herein, affirmatively created a danger of violence by his prospective adoptive father as well, increased James' vulnerability to that danger, and prolonged James's exposure and victimization.

187.    James was a member of two limited and specifically definable groups, namely, (1) children in state custody and (2) children who were the subject of both obvious signs and reports of child abuse.

188.    Defendants' actions and inactions, as described herein, affirmatively put James Dahn at substantial risk of serious, immediate, and proximate harm.

189.    Defendants' conduct, as described herein, created substantial risk of serious, immediate, and proximate harm to James that was obvious and known.

190. When Defendants engaged in the conduct described herein, they acted recklessly and in conscious disregard of that risk.

191. Defendants' conduct, as described herein, when viewed in total, shocks the conscience.

192. Defendants engaged in these actions described herein intentionally, willfully, and wantonly.

193. The acts and omissions of Defendants Little and Tem were engaged in pursuant to the custom, policy, and practice of Defendant Adoption Alliance, which failed to supervise, train, or discipline regarding its agents' evaluation, monitoring, and investigation of prospective adoptive placements for abuse.

194. As a supervisor, Defendant Tem took no action whatsoever to supervise, train or discipline her subordinate, Defendant Little.

195. As a supervisor, Defendant Amedei took no action whatsoever to supervise, train or discipline her subordinate, Defendant Cramer.

196. The acts and omissions of all Defendants caused James damages in that he suffered and continues to suffer extreme physical and mental pain because of the months that Defendants deprived him of his substantive due process rights, created the circumstances that allowed his adoptive father's violent abuse of him to continue and worsen, and prolonged James's exposure to that abuse and victimization.

197. Defendants' acts or omissions were the legal and proximate cause of James Dahn's damages.

**THIRD CLAIM FOR RELIEF**
**(42 U.S.C. § 1983 – Constitutional Failure to Train and Supervise)**
**(Against Defendant Adoption Alliance, Tem, and Amedei)**

198.    James Dahn hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

199.    Defendant Adoption Alliance failed to properly train and supervise its employees with regard to evaluation, monitoring, and investigation of prospective adoptive placements for abuse.

200.    As a supervisory employee of MCDSS, Defendant Amedei had a duty to properly train and supervise MCDSS employees, including Defendant Cramer, with regard to evaluation, monitoring, and investigation of prospective adoptive placements for abuse.

201.    Defendant Adoption Alliance knew, or should have known, that dangerous consequences could be suffered by children whom it was responsible for monitoring (including James Dahn) by failing to properly train and supervise its employees to evaluate, monitor, and investigate prospective adoptive placements for abuse.  Defendant Adoption Alliance could have and should have pursued reasonable methods for the training and supervising of such employees, but failed to do so.

202.    Defendant Amedei knew, or should have known, that dangerous consequences could be suffered by children whom MCDSS was responsible for monitoring (including James Dahn) by failing to properly train and supervise employees, including Defendant Cramer, to evaluate, monitor, and investigate prospective adoptive placements for abuse.  Defendant Amedei could have and should have pursued reasonable methods for the training and supervising of such employees, but failed to do so.

34

203.    The inadequate training and supervision provided by Defendant Adoption Alliance resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to it. One such alternative course – to provide appropriate training and supervision – has been consciously rejected by Defendant Adoption Alliance.

204.    The inadequate training and supervision provided by Defendant Amedei resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to her. One such alternative course – to provide appropriate training and supervision – has been consciously rejected by Defendant Amedei.

205.    In light of the duties and responsibilities of Defendants Little and Tem, the need for specialized training and supervision is so obvious, and the inadequacy of the training and/or supervision is so likely to result in the violation of constitutional rights such as those described herein, that Defendant Adoption Alliance is liable for its failure to so train and to appropriately supervise its employees.

206.    In light of the duties and responsibilities of Defendants Amedei and Cramer, the need for specialized training and supervision is so obvious, and the inadequacy of the training and/or supervision is so likely to result in the violation of constitutional rights such as those described herein, that Defendant Amedei is liable for its failure to so train and to appropriately supervise MCDSS employees, including Defendant Cramer.

207.    Defendant Adoption Alliance's adherence to its inadequate or non-existent training regarding evaluation, monitoring, and investigation of prospective adoptive placements for abuse, despite the fact that it knew or should have known that its inadequate training and supervision in that respect failed to prevent illegal conduct by its employees constitutes

35

deliberate indifference to the constitutional rights of the children whose adoptive placements it was responsible for monitoring.

208.    Defendant Amedei's adherence to her inadequate or non-existent training regarding evaluation, monitoring, and investigation of prospective adoptive placements for abuse, despite the fact that she knew or should have known that her inadequate training and supervision in that respect failed to prevent illegal conduct by MCDSS employees, including Defendant Cramer, constitutes deliberate indifference to the constitutional rights of the children whose adoptive placements she and those under her supervision were responsible for monitoring.

209.    Defendant Adoption Alliance's policies, customs, or practices in failing to properly train and supervise its employees were the moving force behind and proximate cause of the violation of James Dahn's constitutional rights.

210.    MCDSS and Defendant Amedei's policies, customs, or practices in failing to properly train and supervise MCDSS employees were the moving force behind and proximate cause of the violation of James Dahn's constitutional rights.

211.    The actions of Defendants Adoption Alliance, Tem, and Amedei as described herein deprived James Dahn of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused him other damages.

### FOURTH CLAIM FOR RELIEF
### (, Pursuant to Colorado Common Law and C.R.S. § 24-10-118)
### (Against Defendants Adoption Alliance, Amedei, Cramer, Little, and Tem)

212.    James Dahn hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

213.    The behavior of the Defendants in affirmatively denying James Dahn proper monitoring, investigation, and evaluation of his prospective adoptive placement for abuse, for the reasons as described herein and while he was a minor child in state custody with no means to protect himself, was so outrageous and so extreme that reasonable members of the community would regard such behavior as atrocious, and was done recklessly or with the intent of causing James Dahn severe emotional distress.

214.    Defendants Amedei and Cramer characterized as "unfounded" and not requiring "further safety action" multiple reports of abuse, observed signs of abuse including but not limited to visible bruising, a black eye, and a 25-pound weight loss, excessive absences, and Jeremiah Lovato's shifting excuses for denying medical care and pulling James Dahn out of school entirely.  Defendant Amedei and Defendant Cramer had the power and responsibility to initiate the investigation that could have protected James Dahn.  They saw mounting signs of abuse over the months when they wielded that power, yet chose, repeatedly, not to exercise it.  Therefore, Defendants Amedei and Cramer engaged in extreme and outrageous conduct and knew or should have known that their actions would cause James Dahn severe emotional distress.

215.    Defendants Adoption Alliance, Little and Tem saw escalating indications of abuse over the year they were responsible for James Dahn's safety, yet chose, over and over again, to do nothing to stop it.  Repeatedly, for months, they affirmatively chose not to investigate child abuse in the face of James Dahn's black eyes, bruising and weight loss, a series of canceled appointments, extensive school absences, and frantic reports from school officials.  Therefore, Defendants Adoption Alliance, Little and Tem engaged in extreme and outrageous conduct and

knew or should have known that their actions would cause James Dahn severe emotional distress.

216.    The Defendants' described acts were utterly intolerable, and would lead a reasonable member of the community to conclude that their conduct was extreme and outrageous.

217.    The Defendants' conduct described herein was willful and wanton, in that it was committed purposefully and under circumstances that each Defendant must have realized as dangerous, done heedlessly and recklessly, without regard to the consequences, or the rights and safety of others, particularly James Dahn.

218.    As a result of the Defendants' conduct described herein, James Dahn has suffered severe emotional distress and pain and suffering as well as other damages.

### FIFTH CLAIM FOR RELIEF
#### (Negligence)
#### (Against All Defendants)

219.    James Dahn hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

220.    Defendants each owed a duty of care to James Dahn in monitoring and investigating his adoptive placement, and ultimately owed him a duty of care to protect him from abuse at the hands of his prospective adoptive father, and to cause him to be removed from the abusive environment in which they had placed him and/or allowed him to remain.

221.    Defendants Amedei's and Cramer's conduct as described above breached their duty of care to James Dahn by, for example (but not limited to), characterizing as "unfounded" and not requiring "further safety action" multiple reports of potential child abuse; dismissing the

38

reasonable (and valid) concerns of law enforcement and school officials that Jeremiah Lovato was abusing James Dahn; and observing repeated, demonstrable, mounting signs that Jeremiah Lovato was abusing James Dahn, such as visible bruising, a black eye, extreme weight loss, excessive absences from school, and Jeremiah Lovato's shifting excuses for denying medical care to young James Dahn and pulling James Dahn out of school entirely; yet each time when faced with these signs and reports, affirmatively, negligently or recklessly choosing not to initiate the investigation that could have protected James Dahn or otherwise taking action to cause James to be removed from the environment in which they had allowed him to remain.

222.    Defendants Adoption Alliance's, Little's and Tem's conduct as described above breached their duty of care to James Dahn by, for example, permitting Jeremiah Lovato to cancel scheduled home visits and failing to reschedule those visits; affirmatively choosing to dismiss reports of potential abuse from James Dahn's school and counseling his school officials that they were overreacting; affirmatively opting not to interview James Dahn alone outside of the presence of Jeremiah Lovato; observing demonstrable and mounting signs of child abuse on James Dahn such as visible bruising and a 25-pound weight loss; yet each time when faced with these signs and reports, affirmatively choosing not to halt or even delay the adoption; and instead approving the adoption, and abandoning James Dahn to the sadistic abuse of, Jeremiah Lovato, and failing to otherwise take action to cause James Dahn to be removed from the abusive environment in which they had placed young James and caused him to remain.

223.    Defendants knew or should have known that their conduct would cause James Dahn physical and emotional injuries as well as other damages.

224. Defendants' negligence proximately and actually caused James Dahn significant physical injuries, emotional distress, and other damages.

225. James Dahn suffered profound and lasting physical injuries, emotional distress, ongoing psychological injuries, and other damages as a result of Defendants' actions and inactions.

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in his favor and against each of the Defendants, and award him all relief allowed by law, including but not limited to the following:

      (a) Appropriate relief at law and equity;

      (b) Declaratory relief and other appropriate equitable relief;

      (c) Economic losses on all claims as allowed by law;

      (d) Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, loss of companionship and association with family members, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

      (e) Punitive damages on all claims allowed by law and in an amount to be determined at trial;

      (f) Attorneys fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

      (g) Pre- and post-judgment interest at the appropriate lawful rate;

      (h) Any further relief that this court deems just and proper, and any other relief as allowed by law.

**PLAINTIFF HEREBY DEMAND A JURY TRIAL ON ALL ISSUES SO TRIABLE.**

DATED this 13th day of September 2013.

KILLMER, LANE & NEWMAN, LLP

*s/ Mari Newman*

_____

Mari Newman
Darold W. Killmer
Sarah M. Morris.
1543 Champa St., Ste. 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001 (fax)
mnewman@kln-law.com
dkillmer@kln-law.com
smorris@kln-law.com

David Webster
THE LAW FIRM OF JARAY & WEBSTER, LLC
985 Pico Point
Colorado Springs, CO 80905
719-633-6620
david@jaraywebsterlaw.com

ATTORNEYS FOR PLAINTIFF