IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02504-RM-CBS

JAMES DAHN,

       Plaintiff,

v.

ADOPTION ALLIANCE,
MELANIE TEM, individually and in her official capacity,
VICKI LITTLE, individually and in her official capacity,
AUDREY AMEDEI, individually and in her official capacity, and
AMANDA CRAMER, individually and in her official capacity,

       Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

Magistrate Judge Craig B. Shaffer

      This civil action comes before the court on: (1) a Motion to Dismiss from Defendants Amedei and Cramer; (2) Defendants Adoption Alliance's and Melanie Tem's Motion to Dismiss; and (3) Defendant Vicki Little's Motion to Dismiss First, Second, Fourth, and Fifth Claims for Relief.  Pursuant to the Order Referring Case dated September 30, 2014 (doc. #16) and the memoranda dated November 20, 2013 (doc. #40), December 3, 2013 (docs. #53 and #54), and December 30, 2013 (doc. #78), these matters were referred to the Magistrate Judge.  The court has reviewed the Motions and accompanying Briefs (docs. #34 and #49), the Responses and Briefs (docs. #73, #74, #87, #88, and #89), the Replies (docs. #92, #96, and #98), the pleadings, the entire case file, and the applicable law and is sufficiently advised in the premises.

      I also considered and sincerely appreciated counsels' oral presentations during the hearings held on December 3, 2013 and December 20, 2013, and the motion hearing on August

20, 2014.  At the conclusion of the August 20 hearing, this court advised counsel of my intention

to recommend that the district judge grant in part and deny in part the pending motions to

dismiss.  I have continued my research since the August 20 hearing.  In light of counsel's

arguments and with the benefit of my additional research, I now believe the motions must be

granted.  This Recommendation sets forth my findings and explains the bases for my

conclusions.

## FACTUAL BACKGROUND

Plaintiff James Dahn was born in October of 1994 in Oklahoma.  After suffering abuse

from his biological parents, he was removed from the family home in 2003 and placed into the

protective custody of the State of Oklahoma.  He lived in numerous foster homes until the age of

twelve.  In 2007, an adoption agency not a party to this case matched James Dahn and Jeremiah

Lovato as an adoptive parent-child pair.  On January 3, 2008, then-13-year-old James Dahn

arrived in Craig, Colorado and was placed in Jeremiah Lovato's physical custody.  Upon his

placement with Mr. Lovato, James Dahn remained a foster child until his adoption by Mr.

Lovato was finalized by the District Court for Moffat County, Colorado in December 2008.  *See*

Complaint (doc. #1) at 3-7 of 41.

Defendant Adoption Alliance ("AA") was a Colorado nonprofit corporation and private

adoption agency licensed by the State of Colorado.[1]  Adoption Alliance contracted with the State

of Oklahoma and/or the State of Colorado to monitor James Dahn's placement with Mr. Lovato

until the adoption was finalized.  Adoption Alliance investigated the prospective match and

ultimately issued a formal report approving it.  *Id.* at 3-8 of  41.  Defendant Tem was employed

as a Placement Supervisor by Defendant AA.  Defendant Little was an independent contractor

---

[1] Adoption Alliance voluntarily dissolved on or about March 31, 2012.

assigned by AA as a caseworker to James Dahn's placement.

After James Dahn started school in September 2008, school officials observed signs of suspected child abuse. Between September 2008 and December 2008, school officials made three reports of suspected child abuse of James Dahn to the Moffat County Department of Social Services (MCDSS). At all times relevant to the Complaint, Defendants Amedei and Cramer were employed as caseworkers by MCDSS and were responsible for investigating the allegations of child abuse. *Id.* at 12-18 of 41.

On December 11, 2008, the District Court for Moffat County, Colorado finalized Mr. Lovato's adoption of James Dahn. School officials made a fourth report of suspected child abuse of James Dahn on February 27, 2009. On March 6, 2009, Mr. Lovato withdrew James Dahn from school and soon thereafter moved with him to Colorado Springs, Colorado. *Id.* at 19-23 of 41.

On January 5, 2010, Mr. Lovato was arrested in Colorado Springs and charged with crimes of assault and child abuse against James Dahn that occurred between October 15, 2009 and January 4, 2010. On February 8, 2011, Mr. Lovato was convicted by a jury of numerous counts of assault and child abuse and sentenced on May 2, 2011 to 119 ½ years to life in the Colorado Department of Corrections. *See People v. Lovato*, El Paso County criminal case no. 2010CR53. Mr. Lovato filed a Notice of Appeal on June 15, 2011. *See id.* On February 8, 2012, Mark J. Hines was duly appointed as James Dahn's Conservator by the District Court of El Paso County, Colorado, Case No. 11PR1288. James Dahn is now over the age of 18.

Mr. Dahn brings five claims for relief. First, he alleges pursuant to Title 42 U.S.C. § 1983 that Defendants AA, Little, and Tem violated his Fourteenth Amendment right to substantive due process based on the special relationship doctrine. Second, he alleges pursuant

to § 1983 that all Defendants violated his Fourteenth Amendment right to substantive due process based on the state-created danger doctrine.  Third, he alleges pursuant to § 1983 that Defendants AA, Tem, and Amedei violated his constitutional rights by failing to train or supervise their employees.  Fourth, Mr. Dahn alleges intentional infliction of emotional distress by all Defendants pursuant to Colorado common law and Colo. Rev. Stat. § 24-10-118.  Fifth, he alleges negligence against Defendants AA, Tem, and Little pursuant to Colorado common law. *See* Complaint, at 28-40 of 41.  Mr. Dahn seeks declaratory relief, compensatory and punitive damages, fees, costs, and interest.  *Id*. at 40 of 41.

## ANALYSIS

### A.  *Plaintiff's Official Capacity Claims*

Rule 12(b)(1) of the Federal Rules of Civil Procedure empowers a court to dismiss a complaint for "lack of jurisdiction over the subject matter."  Dismissal under Rule 12(b)(1) is a determination that the court lacks authority to adjudicate the matter.  *See Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir.1994) (recognizing that federal courts are courts of limited jurisdiction and may only exercise jurisdiction when specifically authorized to do so).  The determination of subject matter jurisdiction is a threshold issue of law, *Madsen v. U.S. ex rel. U.S. Army Corps. of Engineers*, 841 F.2d 1011, 1012 (10th Cir. 1987), that the court addresses before turning to the merits of the case.  *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002).  As the party asserting jurisdiction, Mr. Dahn bears the burden of establishing that this court has jurisdiction to hear his claim.  *American Fair Credit Ass'n v. United Credit Nat. Bank*, 132 F. Supp. 2d 1304,1308-09 (D. Colo. 2001) (citation omitted).  A motion to dismiss under Rule 12(b)(1) may consist either of a facial or factual attack on the complaint.  *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir.1995).  Because Defendants Amedei and Cramer present a facial attack, the court

must accept the allegations of the Complaint as true.  *Id.*

Defendants Amedei and Cramer contend that Mr. Dahn's claims against them in their official capacities are barred by Eleventh Amendment immunity.  This argument must be construed as a challenge to the court's subject matter jurisdiction.  *See Ruiz*, 299 F.3d at 1180 ("an assertion of Eleventh Amendment immunity concerns the subject matter jurisdiction of the district court");  *Fent v. Okla. Water Res. Bd.*, 235 F.3d 553, 559 (10th Cir. 2000) ("Once effectively asserted [Eleventh Amendment] immunity constitutes a bar to the exercise of federal subject matter jurisdiction.") (original emphasis omitted)).

To the extent that Mr. Dahn is suing Defendants Amedei and Cramer in their official capacities, he is actually attempting to impose liability on their employer, the Moffat County Department of Social Services.  *See Hafer v. Melo*, 502 U.S. 21, 25 (1991) (suit against a state official in his or her official capacity is treated as a suit against the state); *Brandon v. Holt*, 469 U.S. 464, 471-73 (1985) ("a judgment against a public servant in his official capacity imposes liability on the entity he represents . . . .") (internal quotation marks and citation omitted); *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1009 (10th Cir. 1998) ("[a]n action against a person in his official capacity is, in reality, an action against the government entity for whom the person works.").  "[W]hen a suit seeks money damages against an official of a state agency, suing that official in his or her official capacity, then the real party in interest is the state, and the suit is barred by the Eleventh Amendment." *ANR Pipeline Co. v. Lafaver*, 150 F.3d 1178, 1187 (10th Cir. 1998) (internal quotation marks and citation omitted), *overruled on other grounds by Hill v. Kemp*, 478 F.3d 1236, 1259 (10th Cir. 2007).

Moffat County's Department of Social Services is an arm of the state.  *See Schwartz v. Jefferson County Dept. of Human Services,* No. 09-cv-00915-WJM-KMT, 2011 WL 1843309, at

**1-6 (D. Colo. May 16, 2011) (dismissing individual defendants sued in their official capacities who, as employees of Jefferson County Department of Human Services and Denver County Department of Human Services, were entitled to Eleventh Amendment immunity); *Pierce v. Delta County Dept. of Social Services*, 119 F. Supp. 2d 1139, 1147-48 (D. Colo. 2000) (dismissing § 1983 claims against employees in their official capacities because, as an arm of the state, the Delta County Department of Social Services was not a "person" within the meaning of § 1983); *Wigger v. McKee*, 809 P.2d 999, 1002–04 (Colo.App. 1990) (dismissing § 1983 claims against employees in their official capacities because Arapahoe County Department of Social Services is an arm of the state and not a "person" within the meaning of § 1983). Mr. Dahn has conceded that he cannot sue Defendants Amedei or Cramer in their official capacities for monetary damages.

The Eleventh Amendment does not always bar actions in federal court seeking injunctive relief against state officials. *See Idaho v. Coeur D'Alene Tribe of Idaho*, 521 U.S. 261, 276-77 (1997) ("where prospective relief is sought against individual state officers in a federal forum based on a federal right, the Eleventh Amendment, in most cases, is not a bar"); *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 n.10 (1989) ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State.") (internal quotation marks and citation omitted); *Ex parte Young*, 209 U.S. 123, 159-60 (1908) (holding that the Eleventh Amendment generally does not bar official-capacity claims seeking prospective injunctive relief from a state official); *Meiners v. Univ. of Kansas*, 359 F.3d 1222, 1232 (10th Cir. 2004) ("[T]he Eleventh Amendment does not prohibit a suit in federal court to enjoin prospectively a state official from violating federal law.") (citations omitted).

Here, however, Mr. Dahn states no cognizable claim for prospective injunctive relief. Plaintiff's counsel acknowledged during the hearings on December 20, 2013 and August 20, 2014 that her client is no longer a minor, no longer in foster care, and no longer living in Moffat County.  Mr. Dahn has not alleged a likelihood of future harm by Ms. Amedei or Ms. Cramer. Plaintiff's request for declaratory relief does not state a claim for prospective injunctive relief. *See, e.g., Meiners*, 359 F.3d at 1232 (claims for back pay, monetary damages, and retrospective declaratory relief barred by Eleventh Amendment); *Lawrence v. Kuenhold*, 271 Fed. Appx. 763, 766 (10th Cir. Mar. 27, 2008) ("Lawrence and Greenstreet do not specify what form declaratory relief would take and their complaint cannot be read to request declaratory relief in the true legal sense. A declaratory judgment is meant to define the legal rights and obligations of the parties in anticipation of some future conduct, not simply to proclaim liability for a past act."); *Green v. Branson*, 108 F.3d 1296, 1300 (10th Cir. 1997) (since plaintiff was no longer a prisoner within the control of the prison, "the entry of a declaratory judgment in [his] favor would amount to nothing more than a declaration that he was wronged, and would have no effect on the defendants' behavior towards him.").

During the hearing on August 20, 2014, Plaintiff's counsel argued that her client also was seeking a formal apology, which she characterized as a form of prospective injunctive relief.  My own research has found a split of authority on the question of whether a trial court may use its equitable power to order a defendant to apologize.  *See, e.g., Kitchen v. Essex County Correctional Facility,* No. 12-2199 (JLL), 2012 WL 1994505, at *4 (D.N.J. May 31, 2012) (holding that "[t]he remedy of 'apology' . . . is not cognizable, either within the meaning of a § 1983 action or as a general legal remedy that a court has the power to order, under any provision"); *Norris v. Poole*, No. 8:10-750-JFA-BHH, 2010 WL 1903970, at *3 (D. S.C. Apr.

19, 2010) ("The injunctive relief of compelling a government official to issue a published apology is . . . in the form of mandamus relief," which is "is only available in extraordinary circumstances[.]"); *Burkes v. Tranquilli*, No. 08-474, 2008 WL 2682606, at *4 (W.D. Pa. July 2, 2008) (to the extent an apology could be construed as injunctive relief, "such a claim for injunctive relief fails to state a claim as a matter of law" since the court cannot order a defendant to speak in a manner that may well contravene the beliefs he or she holds). *See also Letherbury v. City of Philadelphia*, No. 96-3377, 1998 WL 47355, at *3 n.10 (E.D. Pa. Feb. 4, 1998) (noting that there is no constitutional right to an apology). *But see Villescas v. Abraham,* 285 F. Supp. 2d 1248, 1256 (D. Colo. 2003) (concluding that an order requiring the defendant to issue a written apology was not beyond the court's equitable authority);[2] *Wells v. Lobb & Company, Inc.*, No. 97-WM-1011, 1999 WL 1268331, at *5 (D. Colo. Dec. 1, 1999) (ordering, without explanation or analysis, that each defendant deliver a letter of apology to each aggrieved individual). Given the court's Recommendation on Plaintiff's § 1983 claims, I need not resolve this split of authority or express any views on the competing lines of cases.

Mr. Dahn's claims for money damages and declaratory relief against Defendants Amedei and Cramer in their official capacities are properly dismissed pursuant to Rule 12(b)(1).

## B. *Plaintiff's Substantive Due Process Claims*

Rule 12(b)(6) states that a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." *See* Fed. R. Civ. P. 12(b)(6).

In considering a motion under Rule 12(b)(6), a court must determine

---

[2] In construing the scope of its equitable authority, the court in *Villescas* relied upon *Desjardins v. Van Buren Community Hospital*, 969 F.1d 1280, 1282 (1st Cir. 1992). There, the trial court required the defendant to make a public apology to plaintiff. On appeal, the First Circuit specifically declined to address this issue on its merits, finding that the "Defendant waived [his First Amendment objection] in the district court." I am not certain that *Desjardins* has much precedential value for purposes of the instant discussion.

whether the allegations in the complaint are sufficient to state a claim within the meaning of Fed.R.Civ.P. 8(a).  All well-pleaded allegations of the Complaint must be accepted as true.  Mere conclusory statements or legal conclusions masquerading as factual contentions will not suffice to defeat a motion to dismiss.

A court must review the Complaint to determine whether it contains enough facts to state a claim to relief that is plausible on its face.   [A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely.  The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted.

*Thome v. Cook*, No. 11-cv-03320-RM-MEH, 2014 WL 1613101, at *1 (D. Colo. Apr. 22, 2014) (internal quotation marks and citations omitted).

All of the Defendants move to dismiss the substantive due process claims against them. The Fourteenth Amendment of the U.S. Constitution provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV. "The Fourteenth Amendment  . . . contains a judicially recognized substantive due process component that protects an individual's life, liberty and property against certain government actions regardless of the fairness of the procedures used to implement them."  *Schnurr v. Board of County Commissioners of Jefferson County*, 189 F. Supp. 2d 1105, 1121 (D. Colo. 2001) (internal quotation marks and citation omitted).  However, "[t]he Due Process Clause of the Fourteenth Amendment by its plain language applies only to state action."  *Gray v. University of Colorado Hosp. Authority*, 672 F.3d 909, 927 (10th Cir. 2012).   Moreover, "*regardless of the circumstances preceding the act*, a negligent act that is directly responsible for causing harm to the victim never constitutes a substantive due process violation because such an act never constitutes a constitutional deprivation of life, liberty, or property."  *Id.* at 929 (emphasis in original).

"The vehicle through which a violation of substantive due process rights pursuant to the

Fourteenth Amendment" is remedied is Title 42 U.S.C. § 1983. *Schnurr*, 189 F. Supp. 2d at

1121. Section 1983 provides a private cause of action for "the deprivation of any rights,

privileges, or immunities secured by the Constitution and laws." *Schnurr*, 189 F. Supp. 2d at

1121 (§ 1983 "was specifically designed to provide a method of redress of violations of the

rights protected under the Fourteenth Amendment by *state actors*") (emphasis in original). *See*

*also Blum v. Yaretsky*, 457 U.S. 991, 1002-03 (1982) (since the United States Supreme Court's

decision in the *Civil Rights Cases*, 109 U.S. 3 (1883), "the principle has become firmly

embedded in our constitutional law that the action inhibited by the first section of the Fourteenth

Amendment is only such action as may fairly be said to be that of the States.") (internal

quotation marks and citation omitted).

    1.    <u>Defendants Adoptive Alliance, Tem and Little</u>

    Defendants AA, Tem, and Little argue that Mr. Dahn has failed to allege facts sufficient

to show that they were "state actors" for purposes § 1983. The parties agree that an essential

element of Mr Dahn's § 1983 claims against Defendants AA, Tem, and Little is that they acted

under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988) ("To state a claim under §

1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the

United States, and must show that the alleged deprivation was committed by a person acting

under color of state law."); *Groman v. Township of Manalapan*, 47 F.3d 628, 638 (3d Cir. 1995)

("The color of state law element is a threshold issue; there is no liability under § 1983 for those

not acting under color of law."). The Fourteenth Amendment "erects no shield against merely

private conduct, however discriminatory or wrongful." *Shelley v. Kraemer*, 334 U.S. 1, 13

(1948) (citations omitted).

    In order for Defendants AA, Tem, or Little to be deemed state actors, Mr. Dahn must

adequately allege facts that would plausibly demonstrate that the private "conduct allegedly causing the deprivation of a federal right' must be 'fairly attributable to the State.'" *Gallagher v. "Neil Young Freedom Concert,"* 49 F.3d 1442, 1447-48 (10th Cir. 1995) (quoting *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982).[3]  As the Tenth Circuit explained in *Wittner v. Banner Health*, 720 F.3d 770, 775 (10th Cir. 2013), "where a litigant seeks to hold a private actor accountable as a state actor for constitutional deprivations, we have applied various analyses and referred to them as the nexus test, the public function test, the joint action test, and the symbiotic relationship test."  However, "no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient." *Mehdipour v. Matthews*, 386 Fed. Appx. 775, 779 (10th Cir. 2010) (quoting *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288, 295 (2001)).

Under the "nexus test," "private actors can become state actors for § 1983 purposes . . . if the state exercises sufficient 'coercive power' over the challenged action." *Wittner*, 720 F.3d at 775 (acknowledging that while the private actor's conduct may implicate state rules or state funding, the challenged action must result "from the State's exercise of coercive power"). "Without a showing of coercion, even 'substantial [state] funding of the activities of a private entity is no more persuasive than the fact of regulation of such an entity in demonstrating that the State is responsible for decisions made by the entity in the course of its business."[4] *Id.* at 776 (quoting *Blum*, 457 U.S. at 1011).  The "public function" test, which "is difficult to satisfy," asks

---

[3] "In cases under § 1983, 'under color' of law has consistently been treated as the same thing as the 'state action' required under the Fourteenth Amendment." *Rendell–Baker v. Kohn*, 457 U.S. 830, 838 (1982).  *See also West*, 487 U.S. at 49 ("[I]f a defendant's conduct satisfies the state-action requirement of the Fourteenth Amendment, that conduct [is] also action under color of state law and will support a suit under § 1983.") (internal quotation marks and citation omitted).
[4] Although Mr. Dahn alleges that Adoption Alliance "affirmatively exercised the power given to it by the States of Colorado and/or Oklahoma," the Complaint is devoid of any facts that would plausibly demonstrate coercive action on the part of any state authorities.

"whether the challenged action is a traditional and exclusive function of the state."[5]  *Wittner*, 720

F.3d at 777 (quoting *Flagg Bros. Inc. v. Brooks*, 436 U.S. 149-157-58 (1978).  The "joint action"

test asks "whether state officials and private parties have acted in concert in effecting a particular

deprivation of constitutional rights."[6]  *Wittner*, 720 F.3d at 777 (quoting *Gallagher v. "Neil*

*Young Freedom Concert*," 49 F.3d 1442, 1453 (10th Cir. 1995)).  *Cf. C.T. v. Liberal School*

*District*, No. 06-2093-JWL, 2007 WL 1579472, at *2 (D. Kan. May 31, 2007) (to satisfy the

joint action test, the public and private actors must share a common, unconstitutional goal; "[t]he

pleadings must specifically present facts tending to show agreement and concerted action").

Finally, the "symbiotic relationship" or "entwinement" test considers whether "the state

'has so far insinuated itself into a position of interdependence' with a private party 'it must be

recognized as a joint participant in the challenged activity.'"  *Wittner*, 720 F.3d at 777 (quoting

*Burton v. Wilmington Parking Authority*, 365 U.S. 715, 725 (1961)).  The Tenth Circuit has

observed that since *Burton*, Supreme Court decisions have construed the symbiotic relationship

test "narrowly."  *Gallagher*, 49 F.3d at 1451.  Even "extensive state regulation, the receipt of

substantial state funds, and the performance of important public functions do not necessarily

establish the kind of symbiotic relationship between the government and a private entity that is

required for state action."  *Id*.

---

[5]*But see* C.R.S. §19-5-205.5 (noting that the Colorado Department of  Human Services "is
authorized to select nonpublic, licensed child placement agencies authorized to handle
adoptions" in order to "promote timely processing of nonpublic agency interstate and foreign
adoptions").

[6] Although the Complaint alleges that Defendant Little received a call "from either Defendant
Cramer or another MCDSS employee making her aware of the reports of suspected abuse," there
is no allegation or suggestion that Defendants Amedei or Cramer, or any other state employee,
acted in concert with or directed the actions or decisions of Adoption Alliance or its
employees/contractors.  *Cf. Anderson v. Suiters*, 499 F.3d 1228, 1233 (10th Cir. 2007) (noting
that a private actor, for purposes of § 1893, does not become a state actor simply because he or
she has received information from a government official).

In arguing that Defendants AA and Tem were state actors, Mr. Dahn broadly asserts (without further analysis) that the Complaint "likely sufficiently plead[s] state action pursuant to all four tests" adopted by the Tenth Circuit.  *See* Plaintiff's Response to Brief in Support of Defendants Adoption Alliance's and Melanie Tem's Motion to Dismiss, at 8.  However, the argument in Plaintiff's Response rests almost exclusively on the "symbiotic relationship" test.  After carefully reviewing the factual allegations in the Complaint, I conclude that Mr. Dahn has failed to show, or even plausibly suggest, that either Colorado or Oklahoma "'so far insinuated itself into a position of interdependence' with [Adoption Alliance, its employees or agents] 'that it must be recognized as a joint participant in the challenged activity.'"

Mr. Dahn largely relies on contractual provisions between AA and the State of Colorado to support his conclusory assertion of a symbiotic relationship.  So, for example, Plaintiff contends that

> 22.    Pursuant to contracts with the State of Colorado, Defendant Adoption Alliance was responsible for (1) determining that the case packet submitted by the adoption placement agency in an interstate adoption subject to the Interstate Compact on the Placement of Children ("ICPC"), C.R.S. § 24-60-1801 *et seq.,* followed procedures related to ICPC adoptions as outlined in state rules, federal rules, statutes and the national AAICPC (Association of Administrators of the Interstate Compact on the Placement of Children); (2) reviewing complete sets of request packets for an adoptive placement from a Colorado sending agency or out-of-state ICPC office and then granting or denying permission for the placement to occur; and (3) establishing follow-up procedures to establish that requested/required post-placement service were being provided in the receiving state.

> \*  \*  \*

> 24.    In 2006, Defendant Adoption Alliance affirmatively exercised the power given to it by the States of Colorado and/or Oklahoma and approved then-36-year-old machinist Jeremiah Lovato as a prospective adoptive parent.

*See* Complaint, at ¶¶ 22 and 24.

A contract, without more, does not suffice to establish state action. *See Phelan v. Torres*, 843 F. Supp. 2d 259, 273 (E.D. N.Y. 2012) ("The fact that the state may contract with a private party to perform a function does not transform the private party into a state actor unless the function is traditionally exclusively a state function."). *Cf. Freeman v. Arapahoe House*, No. 13-cf-0064, 2014 WL 3864307, at *6 (D. Colo. Aug. 6, 2014) ("it is well established that government contracts . . . do not establish a symbiotic relationship").

Even when construed liberally in Mr. Dahn's favor, the Complaint does not present any facts that would demonstrate or suggest that the States of Oklahoma and/or Colorado participated in, coerced, or significantly encouraged any actions on the part of AA, Ms. Tem, or Ms. Little. *Cf. Johnson*, 293 F.3d at 1202-06 (holding that an adoption center was not a state actor for purposes of § 1983 where there was no evidence that the state "has insinuated itself into a position of long-term interdependence" with the adoption center). *See also Gallahger*, 49 F.3d at 1453 (the "mere acquiescence of a state official in the actions of a private party is not sufficient" to transform the private party into a state actor); *Wideman v. Garcia*, No. 08-cv-000966-MSK-MJW, 2009 WL 2809419, at *3 (D. Colo. Aug. 28, 2009) ("[t]raditional relationships with the State, such as state regulation, receipt of state funds, performance of public functions are not sufficient" to satisfy the symbiotic relationship test). Mr. Dahn does not provide factual support for his formulaic allegation that AA, Tem, or Little were acting under color of state law. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (a plaintiff may not rely on mere labels or conclusions, "and a formulaic recitation of the elements of a cause of action will not do"). *Cf. Tiscareno v. Frasier*, No. 2:07-CV-336 TS, 2008 WL 4527340, at *6 (D. Utah, Sept. 29, 2008) (on a motion to dismiss under Rule 12(b)(6), the court must "distinguish between Plaintiff's arguments and [his] actual allegations").

Both in her briefs and during oral argument on August 20, 214, Plaintiff's counsel argued that Defendants AA, Tem and Little were similarly situated with the contract physician in *West v. Atkins*, 487 U.S. at 43, who was under contract to provide medical services to inmates at a state prison.  But the Tenth Circuit took great pains in *Gallagher*, 49 F.3d at 1456 n.3, to narrowly construe the Supreme Court's decision in *West*, suggesting that the Supreme Court "did not expressly undertake any of the four state action inquiries that we have outlined."  The court in *Gallagher* concluded that the holding in *West* might well reflect "a unique coalescing of factors, namely, (1) the provision of services, pursuant to state contract, which the state is constitutionally obligated to provide, (2) in a state facility, (3) to individuals having no other access to those services, and (4) under the heavy influence of state authority."  *Id.*  Mr. Dahn's Complaint does not allege well-pled facts that bear substantial resemblance to the combination of circumstances in *West.*

Finally, Plaintiff insists that his allegations should suffice "at this early stage of the case, where no discovery – as to state action or otherwise – has occurred."  This argument is unavailing in light of the Supreme Court's decision in *Iqbal*.  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements" will "not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).  Faced with a challenge under Rule 12(b)(6), a plaintiff finds no refuge by arguing "that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process through careful case management given the common lament that the success of judicial supervision in checking discovery abuse has been on the modest side."  *Id.* at 685 (quoting *Twombly*, 550 U.S. at 559).  *Cf. Zarebicki v. Devereux Foundation*, No. 09-6205, 2011 WL 2582140, at *9 (E.D. Pa. June 30, 2011) (in dismissing

plaintiff's claims for failing to allege sufficient facts to demonstrate the defendant was a state actor, the court noted that it was insufficient, for purposes of Rule 12(b)(6), for plaintiff to simply allege that discovery would bear out his claim). *But see Cirino-Rodriguez v. William George Agency for Children Services, Inc.*, No. 5:11-CV-1219 (LEK/ATB), 2012 WL 3704960, at *3 (N.D.N.Y. Aug. 27, 2012) (because "the issue of state action in this case is factually nuanced," held that "a determination of whether a close nexus between Defendants and the State exits in this case is better addressed at the summary judgment stage"). In this case, I conclude that Plaintiff Dahn's allegations fail to demonstrate that Defendants Adoption Alliance, Tem or Little were state actors for purposes of § 1983. In light of that pleading deficiency, I recommend that Mr. Dahn's substantive due process claims against those defendants be dismissed.

2. Defendants Amedei and Cramer

The Eleventh Amendment does not bar actions for damages against state officials in their individual capacities. *Pride v. Does*, 997 F.2d 712, 715 (10th Cir. 1993) ("It is well-settled that the Eleventh Amendment bars § 1983 civil actions against the states but permits such suits brought against state officials sued in their individual capacities."). However, state actors are only liable for their own acts, not for private acts. *See DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 197 (1989) ("[a]s a general matter . . . a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause."). The Due Process Clause "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." *Id*. at 196.

States actors may assert the defense of qualified immunity when sued under § 1983, as Defendants Amedei and Cramer have in this case. "The doctrine of qualified immunity protects

government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Messerschmidt v. Millender*, __U.S. __, 132 S.Ct. 1235, 1244 (2012) (internal quotation marks and citations omitted). *See also Duncan v. Gunter*, 15 F.3d 989, 992 (10th Cir. 1994) (same) (internal quotation marks and citations omitted). Whether a defendant is entitled to qualified immunity is a legal question. *Wilder v. Turner*, 490 F.3d 810, 813 (10th Cir. 2007).

> Resolution of a dispositive motion based on qualified immunity involves a two-pronged inquiry. First, a court must decide whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right. Second, . . . the court must decide whether the right at issue was clearly established at the time of the defendant's alleged misconduct. With regard to this second [prong], the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful under the circumstances presented.

*Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009) (internal quotation marks and citations omitted). "Qualified immunity is applicable unless" the plaintiff can satisfy both prongs of the inquiry. *Id. See also Verdecia v. Adams*, 327 F.3d 1171, 1174 (10th Cir. 2003) (once a defendant asserts the defense of qualified immunity, the burden shifts to the plaintiff to show that (1) the defendant violated a constitutional or statutory right and (2) the constitutional or statutory right was clearly established when the alleged violation occurred). "A reviewing court may exercise [its] sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Herrera*, 589 F.3d at 1070.

a. *Whether Plaintiff Has Alleged A Substantive Due Process Violation*

State officials may "be subject to constitutional liability if they . . . create a danger that results in a harm to an individual, even if that harm is not ultimately inflicted by a state official." *Kuyper v. Board of County Commissioners of Weld County, Colorado*, No. 09-cv-00342-PAB-

MEH, 2010 WL 1287534, at * 5 (D. Colo. March 30, 2010) (citation omitted).  *Cf. Gray*, 672 F.3d at 921 (describing the danger creation doctrine as a "narrow exception" to the rule that state actors are not liable for the violent acts of third parties).  To establish a substantive due process claim under the danger creation doctrine, a plaintiff must show that (1) the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically definable group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.  *Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1173 (10th Cir. 2013) (citing *Christiansen v. City of Tulsa*, 332 F.3d 1270, 1281 (10th Cir. 2003)).[7]  Mr. Dahn's Second Claim alleges that Defendants Amedei and Cramer violated his substantive due process rights based on the danger creation doctrine.

In moving to dismiss Plaintiff's Second Claim, Defendants Amedei and Cramer argue that the Complaint fails to allege sufficient facts to support any of the required elements of a danger creation claim, save for Mr. Dahn's status.  More specifically, Defendants' Brief in Support of Motion to Dismiss contends that the Complaint contains no allegations that either Ms. Amedei or Ms. Cramer took any affirmative action to place Mr. Dahn in danger or to create an opportunity for abuse that would not otherwise have existed for Mr. Lovato's actions.

In addressing the first element of the danger creation doctrine, *i.e.,* affirmative actions by state actors that place the plaintiff in harm's way, the Tenth Circuit has emphasized the

---

[7] The Tenth Circuit also acknowledged the policy concerns underlying the requirements for a danger creation claim, including "(1) the general need for restraint; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policy decisions impacting public safety."  *Estate of B.I.C.,* 710 F.3d at 1174 (quoting *Currier v. Doran*, 242 F.3d 905, 920 (10th Cir. 2001)).

importance of distinguishing between affirmative conduct that creates or enhances a danger and a failure to act that merely does not decrease or eliminate a pre-existing danger. *Gonzales v. City of Castle Rock*, 307 F.3d 1258, 1263 (10th Cir. 2002) (holding that the defendants' refusal to enforce a restraining order, "while it did not reduce the danger posed by Simon Gonzales' abduction of the girls, did not create or enhance that danger"), *rev'd on other grounds,* 545 U.S. 748 (2005).

> "[I]naction by the state in the face of a known danger is not enough to trigger the obligation" unless the State has "limited in some way the liberty of a citizen to act on his own behalf." We also recognize[ ] the unremarkable proposition that a complaint seeking recovery under § 1983 based on the state-created danger theory must allege a sufficient *causal link* between the danger created by an affirmative act of the State and the harm inflicted upon a victim by a private party.

*Gray*, 672 F.3d at 916-17 (quoting *Graham v. Independent School District No. I-89*, 22 F.3d 991 (10th Cir. 1994) (internal citations omitted).

In a § 1983 case involving allegations that Department of Human Services employees violated a deceased child's substantive due process rights, the Tenth Circuit held that the plaintiff had sufficiently alleged affirmative conduct.

> Admittedly, the allegation that Defendants discouraged the reporting of abuse *could* be construed to describe both action and inaction. Defendants may have specifically directed individuals interested in Kelsey's welfare to cease reporting abuse *or* their inaction in responding to repeated reports may have had the effect of discouraging those individuals from continuing to report abuse. The court, however, must not only accept [plaintiff's] factual allegation as true, it must also construe that allegation in the light most favorable to him. Under that standard, we conclude he has alleged affirmative conduct on the part of Defendants by asserting they discouraged the reporting of additional incident of abuse against Kelsey. Even in the absence of the required inference, the natural and obvious interpretation of [plaintiff's] allegation, read in context, is that Defendants affirmatively discouraged the reporting of abuse.

*Briggs v. Johnson*, 274 Fed. Appx. 730, 735 (10th Cir. 2008).[8]

Construed in a light most favorable to Plaintiff, the Complaint certainly alleges that Defendants Amedei and Cramer failed to thoroughly or properly investigate repeated reports of suspected abuse by Jeremiah Lovato. *See, e.g.,* Complaint, at ¶ 74 (on September 17, 2008, Defendants Cramer and Amedei "held a meeting with James Dahn and his school counselor"); at ¶ 75 (Defendants chose not to photograph Plaintiff's black eye, "[thus] affirmatively allowing this evidence of physical abuse to be lost"); at ¶ 83 (Defendant Cramer "made the affirmative decision not to speak to James or his adoptive father, in derogation of her duty to conduct an interview with or observance of the child who was the subject of a report of abuse or neglect"); at ¶ 85 ("[a]t no point did Defendant Cramer photograph James Dahn . . . affirmatively allowing the loss of evidence of his additional physical injuries"); at ¶ 117 ("Defendant Amedei affirmatively chose not to interview James Dahn or anyone else, to take photographs . . . of James Dahn's injuries, or take any further action at all to protect James Dahn"); ¶ 129 ("Defendants Amedei and Cramer affirmatively opted against performing an in-depth interview with James Dahn"); ¶ 133 ("Defendants Amedei and Cramer chose not to interview James Dahn alone"); and ¶ 135 ("Defendants Amedei and Cramer chose not to ask James Dahn to stand up or to inspect his body").

In light of the foregoing allegations, Plaintiff argues that Defendants Amedei and Cramer affirmatively placed Mr. Dahn in harm's way by "discouraging the reporting of additional

---

[8] I note, however, that in *Robbins v. Oklahoma*, 519 F.3d 1242 (10th Cir. 2008), the Tenth Circuit declined to extend the danger creation doctrine to a case where the plaintiffs alleged, in part, that the defendants' statements about the qualifications of a privately-owned daycare center had lulled the plaintiffs into a false sense of security about their child's welfare. The court concluded that "allegations of 'lulling' and 'doing nothing' do not give rise to a reasonable expectation of relief, given that *DeShaney* requires an affirmative act before imposing liability." *Id.* at 1252 (but leaving open the possibility that "we might imagine affirmative acts that could be described as 'lulling'").

incidents of abuse against" him and by "actively thwarting the concerned teachers who would have otherwise served as safety valves or potential sources of private aid to their pupil." While this court must accept as true all well-pled facts and draw all reasonable inferences in Plaintiff's favor, I cannot presume facts that Mr. Dahn has not alleged or stretch his allegations as far as he might now wish. So, for example, Plaintiff's Response brief argues that "Defendant Amedei *actively discouraged* [Officer Secules] from responding to, and investigating allegations of abuse in the Lovato home." *See* Plaintiff's Response, at 7. Yet the relevant paragraphs of the Complaint suggest a scenario far more opaque. First, the Complaint concedes that Officer Secules undertook some investigation of the information he received from the school by "telephoning Jeremiah Lovato." *See* Complaint, at ¶ 112. When Officer Secules questioned why Ms. Amedei had not "responded herself to this alarming situation," she "responded defensively to Officer Secules, questioned his jurisdiction to respond to this call at all while simultaneously adamantly choosing not to take any action herself." *Id.* at ¶ 114. While the Complaint avers that Defendant Amedei berated "Officer Secules for his concerns about an abused child," *id.* at ¶ 116, it does not allege that Ms. Amedei specifically instructed Officer Secules to cease his investigation. Fairly construed, Plaintiff's allegations leave the impression that Ms. Amedei was not "affirmatively discouraging" Officer Secules so much as attempting to rationalize her own inaction. The Complaint does not allege that Defendant Amendei's statements had any effect on Officer Secules's actions.

Similarly, Plaintiff's Response insists that the "Complaint repeatedly alleges that Defendants Amedei and Cramer *actively thwarted* the concerned teachers" who expressed concern for Mr. Dahn's safety. *See* Plaintiff's Response, at 7-8 (emphasis added). The Complaint does allege that Defendants Cramer and Amedei met with Mr. Dahn and his school

counsel on September 17, 2008.  *See* Complaint, at ¶ 74.  Yet, upon closer examination, there are

no allegations in the Complaint that actually describe the content of any conversations between

school employees and Ms. Amedei and Cramer.  The Complaint alleges that in September 2008,

"Defendants Amedei and Cramer made the affirmative decision to close their report by

determining 'no further safety action [wa]s necessary' and deeming the report of abuse

'unfounded.'"  *Id*. at ¶ 80.  Plaintiff then asserts that "Defendants Amedei and Cramer illegally

and/or inappropriately dismissed credible and repeated reports made by James Dahn's teachers

and school officials."  *Id.* at ¶¶ 81 and 86.  The Complaint does not allege that Defendant

Amedei and Cramer ever counseled school officials against reporting their suspicions of abuse.[9]

Indeed, the Complaint acknowledges that school officials reported further suspected abuse to the

Moffat County Department of Social Services on September 24, 2008 and February 27, 2009.

Application of the danger creation theory must turn on the facts and allegations in the

specific case before the court.  The need for a nuanced analysis is illustrated by *Currier v.*

*Doran*, 242 F.3d 905 (10th Cir. 2001).  In that case, several state social workers were sued for

substantive due process violations following the death of a minor child who had been removed

from her mother's custody and placed in the legal custody of her father.  The Tenth Circuit

emphasized that it was necessary to "examine each of the Defendants individually to determine if

Plaintiffs have pleaded sufficient facts to state a cause of action under the danger creation

theory."  *Id.* at 919.  The court held that Defendant Doran was properly sued because he was

"responsible for the Childrens Court's decision to grant [the father] legal custody, through either

---

[9] The conspicuous absence of such allegations relative to Defendants Amedei and Cramer is notable, given that the Complaint specifically states that "Defendant Little met with officials from James Dahn's school" and "counseled the officials that they were overacting, effectively removing what had been the only safety values and cutting off sources of aid to James Dahn." *See* Complaint, at ¶100.

his failure to investigate and report to the court or through his affirmative recommendation." *Id.*

The Tenth Circuit specifically noted that Mr. Doran's "failure to investigate allegations of abuse

should be viewed in the general context of the state's *affirmative conduct in removing the*

*children from their mother and placing the children with their father.*" *Id.* at 920, n.7 (emphasis

added).  In contrast, the court in *Currier* held that the plaintiffs had not alleged a substantive due

process violation against Defendant Sentell, because that defendant's involvement occurred only

after the father had been awarded legal custody and did not create the danger that led to the

victim's death.  *Id.* at 921.  The *Currier* decision concluded that the plaintiffs properly alleged a

claim against Defendant Medina, who had been involved in the initial removal of the children

from their mother, who later investigated allegations of abuse after the children had been placed

with their father, and who also allegedly (along with Mr. Doran) instructed the children's mother

to stop making allegations of abuse because it was traumatizing the children.  The Tenth Circuit

held that the plaintiffs could proceed against Defendant Medina only because they "[had] alleged

a constitutional violation by Medina in her instruction to Juarez to stop making allegations of

abuse." *Id.* at 921.  It would be a misreading of *Currier* to suggest a danger creation claim can

rest solely on a failure to investigate or a failure to "rescue" an alleged victim of abuse.  *Cf.*

*Estate of B.I.C.*, 710 F.3d at 1173 (holding that mere negligence is not enough to satisfy the

affirmative conduct element of the danger creation doctrine); *Pena v. Greffet*, 922 F. Supp. 2d

1187, 1226 (D.N.M. 2013) ("[g]enerally, negligence does not trigger the Due Process Clause's

protection").[10]

---

[10]*See also Pierce v. Delta County Department of Social Services*, 119 F. Supp. 2d at 1151
("Although the distinction between cases in which the state has merely failed to protect its
citizens from those in which the state affirmatively injured them is not always an easy one to
draw, *DeShaney* requires a federal court to make such a distinction – distinguishing a state's
'affirmative misdeeds from its omissions, to differentiate misfeasance from nonfeasance."). As

Equally enlightening is Judge Brimmer's decision in *Kuyper v. Board of County Commissioners of Weld County*, No. 09-cv-00342-PAB-MEH, 2010 WL 1287534, at *7 n.10 (D. Colo. Mar. 30, 2010), a case cited with favor in Plaintiff's Response.  In that case, the plaintiffs asserted a substantive due process claim predicated on a danger creation theory and the defendant social workers' placement of a foster child who subsequently sexually abused other minor children in the foster parents' custody.  Defendants moved to dismiss, arguing that the plaintiffs' complaint had not made out a danger creation claim because there was no allegation that defendants took any affirmative action.  Citing *Currier*, Judge Brimmer noted that "a failure to investigate in the face of ongoing evidence of abuse" was sufficient to state a claim "*in the context of the affirmative acts of placing the child in a dangerous home and discouraging reports of abuse.*"  *Id.* at *5 (emphasis added).  In *Kuyper*, the defendants made affirmative misrepresentations that induced the foster parents to accept this child, and thereby created the danger to the abused children.  Notably, in denying the motion to dismiss, Judge Brimmer considered "only those acts allegedly taken in [defendants'] successful attempt to place I.G. in the Kuyper's home and not facts going to what the defendants learned or failed to do thereafter." *Id.* at *7 n.10.

During the August 20 hearing, I alluded to a line of decisions in the Second Circuit holding that

> When state officials communicate to a private person that he or she will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under § 1983 for injury caused by the misconduct. . . . This is so even though none of the defendants are alleged to have communicated the approval explicitly.

the court noted in *Pierce*, a distinction must be drawn between the "doer[s] of harm" and "merely 'inept rescuers' outside the reach of the Due Process Clause and the danger-creation theory."  *Id.* at 1151-52.

24

*Pena v. DePrisco,* 432 F.3d 98, 110-11 (2d Cir. 2005) (but conceding that simply alleging that the individual defendants failed to intercede when misconduct took place, without more, is insufficient to state a claim under the danger creation doctrine).[11]   *Cf. Pearce v. Labella*, 473 F. App'x 16, 18 (2d Cir. 2012) (in a case brought by the estate of a police officer's deceased wife, held that plaintiff had asserted a viable danger creation claim where the defendant police chief had allowed the perpetrator to keep his weapons and remain on duty without psychiatric or mental health intervention, and where the police department had a policy, custom and practice of "turning a blind eye to incidents of police officers involved in domestic violence").   On closer examination, these cases are distinguishable from the facts here.

In *DePrisco,* surviving relatives and administrators' of victims' estates brought a § 1983 action claiming that defendant police officers and the City of New York had violated their substantive due process right to be free from state-created dangers.   In that case, a New York City police officer, Joseph Grey, was known to have a history of drinking problems.   Officer Grey continued to drink heavily throughout his employment, with the full knowledge of his supervisors in the police department.   During the incident in question, Officer Grey began a twelve hour drinking binge at the conclusion of his shift.   His supervisor then asked Grey to drive him to a local strip club, where Grey and other officers continued to drink for another four or five hours.   Grey's supervisor asked Grey to drive him back to the precinct.   Even though Officer Grey was visibly intoxicated, no one made any effort to prevent him from getting back in his car.   Grey drove back to the strip club where he resumed drinking until it was time to return to the precinct for the start of his next shift.   While driving back to the precinct, Grey sped

---

[11]This case was not cited by Plaintiff Dahn or by Defendants Amedei and Cramer, but rather was discovered during my own research.

through multiple red lights and struck and killed several pedestrians.  On appeal, the Second

Circuit concluded that plaintiffs had asserted a danger creation claim by alleging that defendants

encouraged Grey to drink to excess and clearly signaled that he could drive in that condition

without fear of punishment.  In that respect, defendants' implicit approval of Grey's drinking and

driving turned a potential danger into an actual one.

The foregoing facts are materially different from the allegations in Mr. Dahn's

Complaint.  Plaintiff was placed in Mr. Lovato's physical custody on January 3, 2008 and

allegedly was subjected to physical abuse at least as early as May 31, 2008.  See Complaint, at ¶¶

28 and 42.  The Complaint alleges, however, that MCSSD was not contacted about abuse

allegations or suspicions until on or about September 16, 2008 and that Defendants Cramer and

Amedei were assigned to investigate that report on September 17, 2008.  *Id*. at ¶¶ 62 and 74.  At

that point Defendant Little had already conducted a home visit and had not recommended

additional investigation.  *Id*. at ¶ 59.  Even when the court liberally construes the Complaint,

there are no alleged facts that would suggest Defendants Amedei or Cramer took any affirmative

action that exposed Mr. Dahn to any danger to which he was not already exposed.  *See Jones v.

Reynolds*, 438 F.3d 685, 692 (6th Cir. 2006) ("The question is not whether the victim was safer

*during* the state action, but whether [she] was safer *before* the state action than [she] was *after*

it.") (emphasis in original).  As the court noted in *Jones*, "the time for assessing whether an

affirmative act has occurred is not *after* the [state actors] have arrived and temporarily taken

control of the situation, but *before* [they] have arrived."  *Id.* at 694 (emphasis in original).

While not condoning Defendants Amedei's and Cramer's decisions, "returning a person

to a situation with a preexisting danger" does not state a claim under the danger creation

doctrine.  *Id.* at 696.  *Cf. P.W. v. Fairport Central School District*, 927 F. Supp. 2d 76 82-83

(W.D.N.Y. 2013) (in declining to apply the reasoning in *DePrisco*, held that while the actions of school teachers and administrators were inadequate to stop the bullying experienced by the victim, the allegations in the complaint did not support the inference "that the actions by the teachers and administrators . . . amount[ed] to an official sanction of the bullying"); *Cumings v. DeKalb County, Indiana,* No. 1:12-CV-52 JVB, 2013 WL 5007984, at *5 (N.D. Ind. Sept. 12, 2013) (holding that to be liable under the danger creation doctrine, the defendant must have taken action that increased the danger to the victim; "the state must have done 'something that turned a potential danger into an actual one, rather than that it just stood by and did nothing to prevent private violence"). My research has not uncovered any Tenth Circuit decision holding that repeated passive condonation of wrongful conduct equates to affirmative conduct by state actors.

I am mindful that the line between "active" and "passive" facilitation of wrongful conduct is sometime difficult to define. *Cf. Pena,* 432 F.3d at 110. *See also Jones*, 438 F.3d at 692 ("Whether the conduct of government officials in some cases should be treated as a failure to act or as action 'may be a difficult question in the abstract,' but we have always treated governmental conduct as 'fall[ing] on the inaction side of the line' when it does not create or increase the risk of peril posed by the private actor") (internal citations omitted).[12]  Perhaps for that reason, the Tenth Circuit requires that the state actor engage in affirmative conduct that creates or increases the danger in some way. *See, e.g., Armijo v. Wagon Mound Public Schools*, 159 F.3d 1253, 1263 (10th Cir. 1998). "In other words, if the danger to the plaintiff existed prior to the state's intervention [or lack thereof], then even if the state put the plaintiff back in that

---

[12] *See also MAP v. Board of Trustees for Colorado School for the Deaf and Blind*, No. 12-cv-02666-RM-KLM, 2014 WL 3748642, at *10 (D. Colo. Apr. 28, 2014) ("merely placing the word 'affirmative' before [each statement in the Complaint] does not transform inaction into action").

same danger, the state would not be liable because it could not have created a danger that already existed." *Id.*

Faced with the wrenching circumstances of this case, it is understandably tempting to expansively apply the danger creation doctrine. *Cf. Jones*, 438 F.3d at 688 (acknowledging that "[w]hen a claimant attempts to hold public officials responsible for private acts of violence under the Fourteenth Amendment, . . . the depravity of the fact pattern often is enough to make 'a devil[ ] sick of sin'"). The court is deeply concerned by physical or psychological abuse to any human being, particularly a minor. However, I am bound by legal precedents that define the danger creation doctrine and the pleading standards imposed by Fed. R. Civ. P. 8. While Mr. Dahn's factual allegations are emotionally compelling, they do not support the inferences that Plaintiff asks me to make. Although "modern rules of pleading are somewhat forgiving, 'a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.'" *Kuyper*, 2010 WL 1287534, at *2. *See also Forest Guardians v. Forsgren*, 478 F.3d 1149, 1160 (10th Cir. 2007) (the ultimate duty of the court is to "determine whether the complaint sufficiently alleges facts supporting all the elements necessary to establish an entitlement to relief under the legal theory proposed").

Here, I find that the Complaint fails to allege facts that would plausibly demonstrate that Defendants Amedei and Cramer engaged in affirmative conduct that created or increased the danger to Plaintiff posed by Mr. Lovato. Therefore, I conclude that Plaintiff has failed to assert a constitutional violation by Defendants Amedei and Cramer under the danger creation doctrine.[13]

---

[13] Because I find that Plaintiff has not satisfied this essential element, I need not address the other required requirements for a valid danger creation claim under the Due Process Clause.

    *b.*     *Whether Plaintiff's Substantive Due Process Right Was Clearly Established*

"The clearly established inquiry examines whether the contours of the constitutional right were so well-settled, in the particular circumstances presented, that every reasonable . . . official would have understood that what he is doing violates that right." *Lane v. Yohn*, No. 12-cv-02183-MSK-MEH, 2013 WL 4781617, at * 3 (D. Colo. Sept. 6, 2013) (internal quotation marks and citation omitted). "[T]he salient question . . . is whether the state of the law at the time of [the] incident provided 'fair warning'" to Defendants Amedei and Cramer that their alleged conduct was unconstitutional. *Cf. Tolan v. Cotton*, __ U.S. __, 134 S.Ct. 1861, 1866 (2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)). Stated differently, the affirmative defense of qualified immunity "protects all but the plainly incompetent [government official] or those who knowingly violate the law." *Holland ex rel. Overdorff v. Harrington*, 269 F.3d 1179, 1185 (10th Cir. 2001).

"To satisfy this prong, the burden is on the plaintiff to point to Supreme Court or Tenth Circuit precedent (or the clear weight of other circuit courts) that recognizes an actionable constitutional violation in the circumstances presented." *Id.* "It is not necessary for the plaintiff to adduce a case with identical facts, but the plaintiff must identify some authority that considers the issue not as a broad general proposition, but in a particularized sense . . . ." *Id.* There must be "a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." *Duncan*, 15 F.3d at 992 (internal quotation marks and citations omitted).

The Complaint in this case presents a scenario under which Defendants Amedei and Cramer conducted more than one investigation of alleged abuse over a relatively short period of

time.  Plaintiff contends those investigations were woefully inadequate and incomplete.  After

each investigation, Defendants concluded that Mr. Dahn was not being physically abused by

Jeremiah Lovato and, therefore, took no steps to remove James Dahn from that dangerous

environment.  Plaintiff contends in his Second Claim that "Defendants' inactions affirmatively

put James Dahn at substantial risk of serious, immediate, and proximate harm."  This theory,

without more, falls squarely outside established Tenth Circuit precedent.

A savvy judge might construe the allegations in the Complaint very broadly to imply that

Defendants' allegedly perfunctory investigations left Jeremiah Lovato with the impression that

the authorities were not committed to intervening on behalf of Mr. Dahn, thereby implicitly

signaling that Mr. Lovato had free rein to continue his mistreatment.  While I am not suggesting

that the facts ultimately would support this theory or that I have reached any conclusion as to the

merits of the claims and defenses asserted by the parties, at this point in the proceedings I am

required to construe the Complaint and the well-pled facts in a light most favorable to Mr. Dahn.

However, even under the broadest construction of the Complaint, I find that Plaintiff has

failed to satisfy the second prong of the qualified immunity defense.  My research has not

revealed any Tenth Circuit precedent holding under the danger creation doctrine that a state

actor's repeated failure to intervene equated to affirmative, albeit implicit, approval of a private

actor's illegal conduct or that such tacit approval created or increased the risk of harm to the

victim.  Indeed, if I equate such tacit approval to the "allegations of lulling" in *Robbins*, it would

appear that the Tenth Circuit has left this question open.  In the absence of well-established and

controlling Tenth Circuit precedent, I cannot find that Defendants Amedei and Cramer must have

known that their inaction was constitutionally prohibited.  The Tenth Circuit has held

unequivocally that the danger creation doctrine is a "narrow exception" to the general rule that

state actors are not liable for the violent acts of third parties.  *See, e.g., Gray*, 672 F.3d at 921.  I

cannot stretch that "narrow exception" to fit the particular facts of this case.  Similarly, I cannot

conclude that an expansive and perhaps creative interpretation of the Complaint falls squarely

within prior law establishing that Defendants' actions were clearly prohibited.  In short, I find

that Defendants Amedei and Cramer have properly asserted the defense of qualified immunity.

The Second Claim should be denied.

### C.  *Plaintiff's Third Claim for Failure to Train and Supervise*

The Supreme Court has reiterated the long-standing rule from *Monell v. Dept. of Social*

*Services of City of New York*, 436 U.S. 658, 694-95, that "[g]overnment officials may not be held

liable for the unconstitutional conduct of their subordinates under a theory of respondeat

superior."  *Ashcroft v. Iqbal*, 556 U.S. at 676.  *See also City of Canton v. Harris*, 489 U.S. 378,

385 (1989) (a governmental entity "can be found liable under § 1983 only where the

municipality itself causes the constitutional violation at issue.  Respondeat superior or vicarious

liability will not attach under § 1983.") (citing *Monell*, 436 U.S. at 694-95, 698).  The

"longstanding interpretation of § 1983's standards for imposing municipal liability" date back to

*Monell*, "which held that a plaintiff must identify a government's policy or custom that caused

the injury."  *Schneider v. City of Grand Junction Police Department*, 717 F.3d 760, 769 (10th

Cir. 2013).  *See Monell*, 436 U.S. at 690-91, 694 ("Congress did not intend municipalities to be

held liable unless action pursuant to official municipal policy of some nature caused a

constitutional tort.").

> [M]unicipal liability under § 1983 attaches where - and only where - a deliberate
> choice to follow a course of action is made from among various alternatives by
> the official or officials responsible for establishing final policy with respect to the
> subject matter in question. Municipal liability may be based on a formal
> regulation or policy statement, or it may be based on an informal custom so long
> as this custom amounts to a widespread practice that, although not authorized by

> written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage' with the force of law. Municipal liability may be also be based on the decisions of employees with final policymaking authority or the ratification by such final policymakers of the decisions-and the basis for them-of subordinates to whom authority was delegated subject to these policymakers' review and approval.  Finally, municipal liability may be based on injuries caused by a failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused.

*Brammer-Hoelter v. Twin Peaks Charter Academy*, 602 F.3d 1175, 1188-89 (10th Cir. 2010) (internal quotation marks and citations omitted).  "In later cases, the Supreme Court required a plaintiff to show that the policy was enacted or maintained with deliberate indifference to an almost inevitable constitutional injury." *Schneider*, 717 F.3d at 769 (citations omitted).  The Tenth Circuit has confirmed the elements of a *Monell* claim: (1) an official policy or custom; (2) causation; and (3) state of mind.  *Schneider*, 717 F.3d at 769.

As a threshold matter, Mr. Dahn has failed to allege facts that would plausibly support an underlying substantive due process claim against any of the named defendants.  Given that pleading deficiency, the court also must also recommend dismissal of Plaintiff's claim for relief based upon a failure to supervise or train.  *See Estate of Larsen ex. Rel Sturdivan v. Murr*, 511 F.3d 1255, 1264 (10th Cir. 2008) ("without the predicate constitutional harm inflicted by an officer, no municipal liability exists") (citation omitted); *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004) (same) (citation omitted).  *See also Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1317-18 (10th Cir. 2002) ("We will not hold a municipality liable [for constitutional violations] when there was no underlying constitutional violation by any of its officers.") (internal quotation marks and citation omitted); *Ricciuti v. New York City Transit Authority*, 124 F.3d 123, 132 (2d Cir. 1997) ("a claim of inadequate training and supervision under § 1983 cannot be made out against a supervisory body without a finding of a constitutional violation by the persons supervised") (citation omitted); *Wilson v. Meeks*, 98 F.3d 1247, 1255 (10th Cir.

1996) ("a municipality may not be held liable where there was no underlying constitutional violation by any of its officers.").

Moreover, Mr. Dahn only alleges in conclusory fashion the existence of a custom or policy. "[I]n *Monell* and subsequent cases, we have required a plaintiff seeking to impose liability on a municipality under § 1983 to identify a municipal policy or custom that caused the plaintiff's injury." *Board County Com'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 403 (1997) (internal quotation marks and citations omitted). "Locating a policy ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Id*. at 403-04.

Mr. Dahn does not identify any particular deficiencies in the training or supervision of Ms. Cramer, Ms. Tem, or Ms. Little or demonstrate how his injuries could have been prevented by any specific different or better training. The Complaint does not allege the existence of any previous problems generally or particularly about Ms. Cramer, Ms. Tem or Ms. Little that would have suggested a need for different or more training. He does not specify a complete failure to train or supervise or a failure to train or supervise in one limited area. Mere conclusory allegations that an officer is unsatisfactorily trained will not "suffice to fasten liability on" the municipality. *City of Canton*, 489 U.S. at 385.

Third, Mr. Dahn does not allege sufficient facts to suggest a direct causal link between any action of the entities and a constitutional violation. *See Bryan County*, 520 U.S. at 404. In order to hold Defendants AA, Tem, and Amedei liable for failure to train and supervise, Mr. Dahn must allege facts to show that they "directly caused the constitutional violation by instituting an official . . . policy of some nature that was the direct cause or moving force behind

33

the constitutional violations." *Smedley v. Corrections Corp. of America*, 175 F. App'x 943, 946 (10th Cir. Dec. 20, 2005) (citations omitted). *See also Jenkins v. Wood*, 81 F.3d 988, 993 (10th Cir.1996) ("To establish municipal liability, a plaintiff must show (1) the existence of a municipal custom or policy and (2) a direct causal link between the custom or policy and the violation alleged."). "[C]ausal connection is satisfied if Defendants set in motion a series of events that Defendants knew or reasonably should have known would cause others to deprive Plaintiffs of their constitutional rights." *Schneider*, 717 F.3d at 779.

Finally, Mr. Dahn does not adequately allege the requisite state of mind for his Fourth Claim for Relief. Where a plaintiff seeks to create § 1983 municipal liability for failing to prevent the bad acts of a subordinate, the plaintiff must show that the municipality evidenced "deliberate indifference" to the impermissible conduct. *City of Canton*, 489 U.S. at 389. *See also Carr v. Castle*, 337 F.3d 1221, 1229 (10th Cir. 2003) ("The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm."); *Brammer-Hoelter*, 602 F.3d at 1188-89 ("municipal liability may be based on injuries caused by a failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused") (internal quotation marks and citations omitted). To demonstrate deliberate indifference, a plaintiff must show that the defendant "disregarded a known or obvious consequence of his action." *Bryan County*, 520 U.S. at 407 ("a plaintiff who seeks to establish municipal liability . . . must demonstrate that the municipal action was taken with deliberate indifference as to its known or obvious consequences.") (internal quotation marks and citation omitted).

While Mr. Dahn recites the incantation "deliberate indifference," his allegations do not support deliberate indifference.  *See* Complaint, at ¶¶ 200-02, 207 ("Defendant Amedei had a duty to properly train and supervise MCDSS employees," she and AA "knew or should have known that dangerous consequences could be suffered" due to "inadequate training and supervision," and she "could have and should have pursued reasonable methods for the training and supervising of" employees)).  He does not allege that a constitutional violation was a highly predictable consequence, such as when a government entity fails to train employees in specific skills needed to handle recurring situations.  *Bryan County*, 520 U.S. at 409-10.  To the extent that Mr. Dahn alleges that the need for specialized training and supervision was "obvious" and "likely to result in the violation of constitutional rights," again his allegations are merely conclusory.  (*See* Doc. # 1 at ¶¶ 205-06).  Mr. Dahn's allegations are simply insufficient to support deliberate indifference.  *See, e.g., Riddle v. Mondragon*, 83 F.3d 1197, 1205 (10th Cir. 1996) (general, conclusory allegations, without supporting factual averments, are insufficient to state a claim for deliberate indifference in violation of the Eighth Amendment);  *Martin v. Dist. of Columbia*, 720 F. Supp.2d 19, 23 (D.D.C. 2010) (granting city's motion to dismiss § 1983 claim based on inadequate training when allegations did "nothing more than recite the required causal elements of custom or policy liability based on deliberate indifference" and plaintiff's "conclusory statements" were "unsupported by additional factual allegations");  *Jones v. Natesha*, 151 F. Supp. 2d 938, 944–45 (N.D. Ill. 2001) ("It is not enough for a plaintiff to aver a single, conclusory allegation that the defendants' conduct was deliberately indifferent to the plaintiff's constitutional rights.") (internal quotation marks and citation omitted).

In sum, the Complaint is replete with mere labels and formulaic recitations of the elements of a cause of action for failure to train and supervise, without specific factual

allegations to support each claim.  *See, e.g.,* Complaint at ¶¶ 203-04 (conclusorily alleging that "the inadequate training and supervision provided" by AA and Ms. Amedei resulted from a conscious or deliberate choice not to follow an alternative course of providing "appropriate training and supervision.")).  The court finds that the Complaint does not contain enough facts to state a claim for § 1983 municipal liability that is plausible on its face.

> D.  *Plaintiff's State Law Claims*

Defendants have also moved to dismiss the state law claims asserted in Mr. Dahn's Complaint.  Title 28 U.S.C. § 1367(a) grants supplemental or pendent jurisdiction to federal district courts over a plaintiff's state law claims which arise out of the same transaction or occurrence as the federal claims.  A district court has the discretion to decline to exercise supplemental jurisdiction over a state law claim if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).  *See also Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.").  As the court recommends dismissal of Mr. Dahn's § 1983 claims, the only claims over which this court has original jurisdiction, his supplemental state law claims may also be dismissed.  I express no opinions as to the ultimate merits of those claims.

## CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that:

1.      Defendant Vicki Little's Motion to Dismiss First, Second, Fourth, and Fifth Claims for Relief (Doc. # 61) be GRANTED.

2.      Defendants Adoption Alliance's and Melanie Tem's Motion to Dismiss (Doc. # 48) be GRANTED.

3.       The First and Second Claims for Relief against Defendants AA, Little, and Tem be dismissed without prejudice for failure to state a claim to which relief can be granted.

4.       The Motion to Dismiss from Defendants Amedei and Cramer (Doc. #33) be GRANTED.

a.       The First and Second Claims for Relief against Defendants Amedei and Cramer in their official capacities be dismissed without prejudice for lack of subject matter jurisdiction based on Eleventh Amendment immunity.

b.       The First and Second Claims for Relief against Defendants Amedei and Cramer in their individual capacities be dismissed without prejudice for failure to state a claim to which relief can be granted.

5.       The Third Claim for Relief be dismissed without prejudice for failure to state a claim to which relief can be granted.

6.       The Fourth and Fifth Claims for Relief be dismissed without prejudice for lack of supplemental jurisdiction pursuant to Title 28 U.S.C. § 1367(c)(3).

7.       No claims or Defendants remaining, this civil action be dismissed without prejudice.


**Advisement to the Parties**

Within fourteen days after service of a copy of the Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b);  *In re Griego*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the District Court on notice of the basis for the objection will

not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review."  *United States v. One Parcel of Real Property Known As 2121 East 30th Street, Tulsa, Oklahoma*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge.  *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (District Court's decision to review a Magistrate Judge's recommendation *de novo* despite the lack of an objection does not preclude application of the "firm waiver rule");  *International Surplus Lines Insurance Co. v. Wyoming Coal Refining Systems, Inc*., 52 F.3d 901, 904 (10th Cir. 1995) (by failing to object to certain portions of the Magistrate Judge's order, cross-claimant had waived its right to appeal those portions of the ruling);  *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (by their failure to file objections, plaintiffs waived their right to appeal the Magistrate Judge's ruling).  *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (firm waiver rule does not apply when the interests of justice require review).

DATED at Denver, Colorado this 28th day of August, 2014.

BY THE COURT:

 s/Craig B. Shaffer
United States Magistrate Judge