**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 13-cv-02504-RM-CBS

JAMES DAHN,

      Plaintiffs,

v.

ADOPTION ALLIANCE;
MELANIE TEM, individually and in her official capacity;
VICKI LITTLE, individually and in her official capacity;
AUDREY AMEDEI, individually and in her official capacity; and
AMANDA CRAMER, individually and in her official capacity,

      Defendants.

---

## ORDER

---

This matter is before the Court on three separate motions to dismiss Plaintiff's second amended complaint (ECF No. 257, the "Amended Complaint") filed by Defendants Adoption Alliance and Melanie Tem (ECF No. 213), Vicki Little (ECF No. 215), and Audrey Amedie and Amanda Cramer (ECF No. 216).   Following the presentation of oral arguments to U.S. Magistrate Judge Craig Schaffer on July 30, 2015, the magistrate judge entered a Report and Recommendation on July 30, 2015 (ECF No. 259, the "Recommendation") recommending that all Defendants' motions be granted, and in support referred back to a previous recommendation (ECF No. 159, the "Previous Recommendation") the magistrate judge had entered in response to motions to dismiss that the Defendants had filed in response to Plaintiff's previous complaint. Timely objections, and responses thereto, were made to the magistrate judge's Recommendation.

(ECF Nos. 260, 263, 267, 272, 280, 283, 285, 289.)

## I.     LEGAL STANDARD

### A.     Review of the Magistrate Judge's Recommendation

When a magistrate judge issues a recommendation on a dispositive matter, Federal Rule of

Civil Procedure 72(b)(3) requires that the district court judge "determine *de novo* any part of the

magistrate judge's [recommendation] that has been properly objected to."   In conducting his

review, "[t]he district judge may accept, reject, or modify the recommended disposition; receive

further evidence; or return the matter to the magistrate judge with instructions."   Fed. R. Civ. P.

72(b)(3).   An objection to a recommendation is proper if it is filed timely in accordance with the

Federal Rules of Civil Procedure and specific enough to enable the "district judge to focus

attention on those issues – factual and legal – that are at the heart of the parties' dispute."   *United*

*States v. 2121 E. 30th St.*, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting *Thomas v. Arn*, 474 U.S.

140, 147 (1985)).   In the absence of a timely and specific objection, "the district court may review

a magistrate's report under any standard it deems appropriate."   *Summers v. Utah*, 927 F.2d 1165,

1167 (10th Cir. 1991) (citations omitted); *see also* Fed. R. Civ. P. 72 Advisory Committee's Note

("When no timely objection is filed, the court need only satisfy itself that there is no clear error on

the face of the record in order to accept the recommendation.").

### B.     Rule 12(b)(6) Motion

Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a pleading must contain "a

short and plain statement of the claim showing that the pleader is entitled to relief."   Fed. R. Civ.

P. 8(a)(2).   Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must be

2

dismissed if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).   "A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.   Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement."   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. . . ."   *Bell Atl. Corp.*, 550 U.S. at 555 (citations omitted).   "Factual allegations must be enough to raise a right to relief above the speculative level."   *Id*.   A "plaintiff must 'nudge [] [his] claims across the line from conceivable to plausible' in order to survive a motion to dismiss. . . . Thus, the mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims."   *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis in original, internal citation and quotation omitted).

The Tenth Circuit Court of Appeals has held "that plausibility refers to the scope of the allegations in a complaint:   if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs have not nudged their claims across the line from conceivable to plausible."   *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (internal quotation and citation omitted).   The Tenth Circuit has

further noted "that the nature and specificity of the allegations required to state a plausible claim

will vary based on context." *Id*. (Internal quotation and citation omitted.)   Thus, the Tenth

Circuit "concluded the *Twombly/Iqbal* standard is 'a middle ground between heightened fact

pleading, which is expressly rejected, and allowing complaints that are no more than labels and

conclusions or a formulaic recitation of the elements of a cause of action, which the [Supreme

C]ourt stated will not do.'"   *Id*. (Citation omitted.)

      For purposes of a motion to dismiss pursuant to Rule 12(b)(6), the Court must

accept all well-pled factual allegations in the complaint as true and resolve all

reasonable inferences in a plaintiff's favor.   *Morse v. Regents of the Univ. of Colo.*,

154 F.3d 1124, 1126-27 (10th Cir. 1998) (citation omitted); *Seamons v. Snow*, 84 F.3d 1226,

1231-32 (10th Cir. 1996) (citations omitted).   However, "when legal conclusions are involved in

the complaint 'the tenet that a court must accept as true all of the allegations contained in a

complaint is inapplicable to [those] conclusions. . . ." *Khalik*, 671 F.3d at 1190 (quoting *Iqbal*, 556

U.S. at 678).   "Accordingly, in examining a complaint under Rule 12(b)(6), [the court] will

disregard conclusory statements and look only to whether the remaining, factual allegations

plausibly suggest the defendant is liable."   *Id*.

## II.    FACTUAL AND PROCEDURAL HISTORY

      The following factual allegations are taken from Plaintiff's Amended Complaint.   (ECF

No. 257.)

      Plaintiff was born in October of 1994 in Oklahoma.   (*Id*. at ¶ 14.)   After suffering abuse at

the hands of his biological parents, Plaintiff was removed from the family home and placed into

the protective custody of the State of Oklahoma in 2003.   (*Id.* at ¶ 15.)   Plaintiff was moved from foster home to foster home throughout his early childhood, and had lived in over one dozen different foster homes by the age of twelve.   (*Id.* at 18.)   In 2007, an adoption agency not a party to this case matched Plaintiff and Jeremiah Lovato as an adoptive parent-child pair.   (*Id.* at ¶ 42.) On January 3, 2008, then 13 year old Plaintiff arrived in Craig, Colorado and was placed in Lovato's physical custody.   (*Id.* at ¶ 45.)   Upon his placement with Lovato, Plaintiff remained a foster child until his adoption by Lovato was finalized by the District Court for Moffat County, Colorado in December, 2008.   (*Id.* at ¶ 46.)

To monitor Plaintiff's foster placement with Lovato until the adoption was finalized, the State of Oklahoma and/or the State of Colorado contracted with Adoption Alliance, a Colorado nonprofit corporation and private adoption agency licensed by the State of Colorado.   (*Id.* at ¶¶ 12, 20, 22.)   In this role, Adoption Alliance was responsible for following procedures related to adoption placement in an interstate adoption subject to the Interstate Compact on the Placement of Children (the "ICPC"), C.R.S. § 24-60-1801 *et seq.*, which statutes authorize the states of Colorado and Oklahoma to work together to ensure that children who are placed across state lines for foster care or adoption receive adequate protection and support services.   (*Id.* at ¶ 22.) Adoption Alliance committed itself to assume these roles, and a variety of obligations under the ICPC, through its contract with the State of Colorado.   (*Id.* at ¶¶ 25-34.)

As part of its assumed roles through its contract with the State of Colorado, in 2006 Adoption Alliance approved Lovato as a prospective adoptive parent.   (*Id.*at ¶40.)   And in 2007, when Lovato was being considered as a potential adoptive match with Plaintiff, Adoption Alliance

investigated Lovato's background and ultimately issued a formal report approving his status as a potential adoptive parent.   (*Id.* at ¶¶ 43-44.)   This report indicated that Plaintiff had failed to disclose that he had pled guilty to one count of contributing to the delinquency of a minor in 1989 and also that Lovato's parents had subjected him to "physical discipline."   (*Id.*)

During the relevant time, Defendants Melanie Tem and Vicki Little were both employees of Adoption Alliance.   (*Id.* at ¶¶ 10, 11.)   Defendant Tem was employed as a placement supervisor by Adoption Alliance.   Defendant Little was also an employee of Adoption Alliance assigned as a caseworker to Plaintiff's placement.   (*Id.* at ¶ 54.)   In her capacity as caseworker for Plaintiff's adoption, Little was responsible for making monthly post-placement visits with Plaintiff and Lovato from the time of placement until the adoption was finalized.   (*Id.*)   Tem was acting as Little's supervisor at all relevant times.   (*Id.* at ¶ 56.)

During the relevant time, Defendants Audrey Amedei and and Amanda Cramer were employed as caseworkers for the Moffat County Department of Social Services (the "Moffat County DSS").   (*Id.* at ¶¶ 8-9.)

After Plaintiff started school in September, 2008, school officials observed signs of suspected child abuse.   Between September, 2008 and December, 2008, school officials made three separate reports of suspected child abuse to the Moffat County DSS relating primarily to changes they observed in Plaintiff's physical condition.

The first report came shortly after Plaintiff missed two weeks of school at the beginning of the 2008 school year.   (*Id.* at ¶ 80.)   When he did arrive at school in September, 2008, he had the remnants of a black eye and had lost twenty-five pounds, which was reported by school officials to

6

the Moffat County DSS.   (*Id.* at ¶¶ 81-82.)   Defendants Amedei and Cramer were responsible for

investigating the allegations of child abuse.   (*Id.* at ¶¶ 92-93.)   Amedei and Cramer responded by

holding a meeting with Plaintiff and his school counselor and also contacted Lovato by telephone.

(*Id.* at ¶¶ 93, 97.)   Both Plaintiff and Lovato denied that Plaintiff had a black eye, although a

report made by Amedei and Cramer in connection with their in-person meeting with Plaintiff

observes the bruised condition of Plaintiff's eye.   (*Id.* at ¶¶ 94-98.)   Amedei and Cramer's report,

made in connection with this incident, concluded that the report of abuse was unfounded and that

no further investigation or action would be necessary.   (*Id.* at ¶ 99.)

School officials reported a second incident of suspected abuse to Moffat County DSS on

September 24, 2008, based on Plaintiff arriving to school with additional bruises on his right bicep

and right forearm.   (*Id.* at ¶ 101.)   Responding to this report, Cramer spoke only to the school's

health technician, and did not interview Plaintiff or Lovato.   (*Id.* at ¶¶ 101-05.)   Cramer's report

made in connection with this incident also reveals that at this time Moffat County DSS had also

received several emails from teachers concerned for Plaintiff's safety.   (*Id.* at ¶ 103.)

On December 1, 2008, a third report was made to Moffat County DSS after Craig Police

Officer Dale Secules was called to Plaintiff's school to respond to a report that Plaintiff had

another black eye.   (*Id.* at ¶ 130.)   Officer Secules spoke with Amedei about his concern for

Plaintiff, and Amedei responded to Officer Secules' inquiry defensively, questioning his

jurisdiction to investigate the incident.   (*Id.* at ¶¶ 133-135.)   Amedei is alleged to have taken no

further action in response to this report of abuse.   (*Id.* at ¶¶ 136-37.)

Around this same time period, Defendants Adoption Alliance, Tem and Little also received

several indicators that Plaintiff was being mistreated.   In an April 19, 2008 report, Little noted

that Lovato had represented that he could not afford to sign Plaintiff up to play baseball, yet Little

also observed, without reporting, that Lovato had a brand new sports car.   (*Id.* at ¶¶ 58-59.)   In a

May, 2008 report, Little noted that Plaintiff had a bruise, but that Plaintiff and Lovato had

explained it as coming from "wrestling around."   (*Id.* at ¶ 61.)   Little also permitted Lovato to

cancel two scheduled monthly visits in June and July of 2008, and instead spoke to Plaintiff on the

phone.   (*Id.* ¶¶ 70-72.)   In an August, 2008 report, Little documented that Plaintiff had lost "baby

fat" but did not perform or recommend additional investigation.   (*Id.* at ¶¶ 76, 78.)   In her

September 28, 2008 home visit, which Lovato had previously rescheduled from September 19,

Little learned that Plaintiff had been left with Lovato's brother overnight in violation of Adoption

Alliance policies, but did not take any action to reprimand Lovato for this transgression.   (*Id.* at ¶¶

115-16.)   Little's September, 2008 report also documented the Moffat County DSS's reports of

suspected abuse made around that same time.   (*Id.* at ¶ 110.)   During her October, 2008 home

visit, Little made no effort to speak to Plaintiff or to follow-up on the reports of abuse from the

Moffat County DSS of the prior month.   (*Id.* at ¶¶ 121-122.)   In Little's final report of November,

2008, she approved Lovato's adoption of Plaintiff.   (*Id.* at ¶ 128.)   Tem is alleged to have

reviewed and ratified all of the reports made by Little and affirmed Little's decisions not to

investigate further.   (*Id.* at ¶ 129.)

On December 11, 2008, the District Court for Moffat County, Colorado finalized Lovato's

adoption of Plaintiff.   (*Id.* at ¶ 138.)   Subsequently, school officials made a fourth report of child

abuse on February 27, 2009 based on Plaintiff's continued absence from school.   (*Id.* at ¶¶

8

141-142.)   Shortly thereafter, Lovato withdrew Plaintiff from his school to begin homeschooling him.   (*Id.* ¶ 156.)

On January 5, 2010, Lovato was arrested in Colorado Springs and charged with crimes of assault and child abuse against Plaintiff that occurred between October 15, 2009 and January 4, 2010.   (*Id.* at ¶ 178.)   On February 8, 2011, Mr. Lovato was convicted by a jury of numerous counts of assault and child abuse and sentenced on May 2, 2011 to 119 ½ years to life in the Colorado Department of Corrections.   (*Id.* at ¶ 184.)

On October 9, 2012, Plaintiff filed the present lawsuit bringing five claims for relief. First, Plaintiff alleges pursuant to 42 U.S.C. § 1983 that all Defendants violated his Fourteenth Amendment right to substantive due process based on the special relationship doctrine.   Second, he alleges pursuant to § 1983 that all Defendants violated his Fourteenth Amendment right to substantive due process based on the state-created danger doctrine.   Third, he alleges pursuant to § 1983 that Defendants Adoption Alliance, Tem, and Amedei violated his constitutional rights by failing to train or supervise their employees.   Fourth, Plaintiff brings a claim of outrageous conduct under Colorado common law and pursuant to C.R.S. § 24-10-118 (2013).   Finally, Plaintiff brings a claim of negligence against all Defendants under Colorado common law.

## III.   ANALYSIS

### A. Plaintiff's § 1983 Claims against Adoption Alliance, Tem and Little

Defendants Adoption Alliance, Tem and Little argue that Plaintiff's §1983 claims against them fail because they are private actors and were not acting "under color of law," as is required to establish liability under § 1983 against private individuals.   *Gallagher v. Neil Young Freedom*

9

*Concert*, 49 F.3d 1442, 1447 (10th Cir. 1995).   A proper defendant to a § 1983 claim must have

represented the state in some capacity.   *Id.*   Private individuals and entities may be deemed state

actors if they acted together with or obtained significant aid from state officials, or if their conduct

is otherwise chargeable to the state.   *Johnson v. Rodriguez*, 293 F.3d 1196, 1202 (10th Cir. 2002).

In making that determination, the Supreme Court employs a "flexible approach to the state action

doctrine" under which it has "appl[ied] a variety of tests to the facts of each case."   *Gallagher*, 49

F.3d at 1447.   At least four tests have been recognized by the Supreme Court, and endorsed by the

Tenth Circuit, to determine whether a private party should be deemed a state actor subject to

constitutional liability:

> In some instances, the Court has considered "whether there is a sufficiently close
> nexus between the State and the challenged action of the regulated entity so that the
> action of the latter may be fairly treated as that of the State itself." [*Jackson v.
> Metropolitan Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 453, 42 L.Ed.2d 477
> (1974).]   The Court has also inquired whether the state has "so far insinuated itself
> into a position of interdependence" with the private party, *Burton v. Wilmington
> Parking Auth.*, 365 U.S. 715, 725, 81 S.Ct. 856, 861-62, 6 L.#d.2d 45 (1961), that
> there is a "symbiotic relationship" between them, *Moose Lodge No. 107 v. Irvis*,
> 407 U.S. 163, 175, 92 S.Ct. 1965, 1972-73, 32 L.Ed. 2d 627 (1972).   In addition,
> the Court has held that if a private party is " 'a willful participant in joint activity
> with the State or its agents,' " then state action is present.   *Adickes v. S.H. Kress &
> Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605-06, 26 L.Ed.2d 142 (1970) (quoting
> *United States v. Price*, 383 U.S. 787, 794, 86 S.Ct. 1152, 1157, 16 L.Ed.2d 267
> (1966)).   Finally, the Court has ruled that a private entity that exercises "powers
> traditionally exclusively reserved to the State" is engaged in state action.   *Jackson*,
> 419 U.S. at 352, 95 S.Ct. at 454.

*Id.*   These tests have been referred to, respectively, as the (1) nexus test, (2) symbiotic relationship

test, (3) joint action test, and (4) public function test.   Because Plaintiff's objection to the

magistrate judge's recommendation only argues that state action existed under the public function

test and the symbiotic relationship test, (ECF No. 267 at 4), the Court examines only these two.

As explained below, this Court finds that the allegations in Plaintiff's Amended Complaint are insufficient to state a claim against Adoption Alliance, Tem and Little under either of these theories.

       1. <u>Public function</u>

Under the public function test, when a governmental entity delegates one of its traditional or public functions to a private entity, the private entity may be held liable under § 1983 with respect to its performance of that function. *Marsh v. Alabama*, 326 U.S. 501, 506 (1946). However, in order to satisfy this test, the public function must be one "traditionally *exclusivey* reserved to the State. *Jackson*, 419 U.S. at 352 (emphasis added). "This test is difficult to satisfy." *Gallagher*, 49 F.3d at 1456. "While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the State.' " *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 158 (1978) (quoting *Jackson*, 419 U.S. at 356). The Supreme Court has found that certain specific functions are traditionally reserved to the state, including the administering of elections of public officials, *Terry v. Adams*, 345 U.S. 461, 468-70 (1953), the operation of a company owned town, *Marsh*, 326 U.S. at 505-09 (1946), and the management of a city park, *Evans v. Newton*, 382 U.S. 296, 298-302 (1966). By contrast, the Supreme Court has found that other functions were not those traditionally reserved to the state, including the provision of nursing home care, *Blum v. Yaretsky*, 457 U.S. 991, 1011-12 (1982), the education of children, *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982), and the enforcement of a statutory lien by a private warehouse, *Flagg Bros., Inc.*, 436 U.S. at 161-64.

While the Supreme Court has not addressed whether the adoption of children would be

considered an exclusive state function, other lower courts have found this to be the case.   *See, e.g.*

*Smith v. Beasley*, 775 F.Supp.2d 1344, 1353 (M.D. Fla. 2011); *Perez v. Sugarman*, 499 F.2d 761,

765 (2d Cir. 1974) (actions of a private foster agency were taken under color of state law as they

would have been performed by the city had the agency not undertaken them and the agency was

presumed to be an authorized agency under state law); *Phillips ex rel. Green v. New York*, 453

F.Supp.2d 690, 738 (S.D.N.Y. 2006) (same); *Harris v. Lehigh Cnty. Office of Children & Youth

Servs.*, 418 F.Supp.2d 643, 651 (E.D.Pa. 2005) (foster care agencies that assist in the placement of

foster children perform a function that has traditionally been the exclusive prerogative of the State

regardless of whether the child is forcibly taken from his home).   Courts in other jurisdictions have

held the opposite.   *Milburn by Milburn v. Anne Arundel Cnty. Dep't of Soc. Servs.*, 871 F.2d 474,

479 (3th Cir. 1989) ("The care of foster children is not traditionally the exclusive prerogative of the

State . . . .");   *Rayburn ex rel. Rayburn .v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001) (affirming

district court finding that public function test not met because "the [S]tate exercised no

encouragement of the Hogues' actions, nor is foster care traditionally an exclusive [S]tate

prerogative.") (alterations in original); *Phelan ex rel. Phelan v. Torres*, 843 F.Supp.2d 259, 271

(E.D.N.Y. 2011) ("[F]oster care agencies do not perform a function that has been 'traditionally

*exclusively* reserved to the State.'") (emphasis in original, citing *Jackson*, 419 U.S. at 352).

Although there is a dearth of case law on the issue in this jurisdiction, the Tenth Circuit has

on at least one occasion determined that a private foster care agency did not perform functions

traditionally reserved exclusively to the state.   *Johnson,* 293 F.3d at 1203-04.   In *Johnson*, the

biological father of a child who was adopted through a private adoption agency in Utah sought to

bring §1983 claims against the adoption center, adoptive parents and biological mother claiming that certain of Utah's adoption statutes violated his rights to due process under the Fourteenth Amendment.  *Id.*  Looking specifically at the public function test as articulated in *Gallagher*, and noting that it presents "an arduous standard to satisfy," the Tenth Circuit found that the test was not satisfied in that case with respect to the adoption center because it was not the "exclusive means to adopt children in Utah."  *Id.* at 1203.   The Tenth Circuit gave weight to the fact that there were numerous other adoption agencies existing in the state, that all the actors involved in that controversy were private parties, and that there "was no exclusive state involvement in the adoption process."  *Id.*

In light of the Tenth Circuit's holding in *Johnson*, this Court finds that Adoption Alliance and its agents, Tem and Little, were not serving a function traditionally reserved to the state.   As in *Johnson*, Plaintiff's Amended Complaint contains no allegations that Adoption Alliance was the exclusive means to adopt out-of-state children, nor does it contain allegations that there is exclusive state involvement in the adoption of children in Colorado, either now or in the past. Accordingly, Plaintiff has failed to establish that these Defendants acted under color of state law through the public function test.   *Johnson*, 293 F.3d at 1203-04.

As noted above, numerous other jurisdictions are divided on the issue of whether an adoption agency is said to perform a function traditionally reserved exclusively to the state, and Plaintiff relies in particular upon the holding in *Smith v. Beasley*.   However, the facts relied upon the Florida District Court in that case are distinguishable from the present situation.   In *Beasley*, the court found it determinative that the legislature in Florida had stated by statute that "the state

13

has traditionally provided foster care services to children who have been the responsibility of the state." 775 F.Supp.2d at 1353 (quoting Fla. Stat. § 409.1671(1)(f)). However, no such statutory language exists under Colorado law. Plaintiff further argues that *Johnson* would not apply to the facts in this case because the ward in that case was never in the legal custody of the state, but rather the state only issued an adoption decree. However, the Tenth Circuit's holding in *Johnson* with respect to the public function test did not include any analysis with respect to the state's role in that case, and indeed the private adoption agency that was a defendant in *Johnson* was similarly situated to Adoption Alliance in this case. The Court finds that Plaintiff's arguments in this vein are not persuasive. Plaintiff has not alleged sufficient facts to state a cause of action under § 1983 against Adoption Alliance, Little or Tem under a public function theory.

2. Symbiotic relationship

In support of his argument that the symbiotic relationship test is satisfied in this case, Plaintiff points to several allegations in the Amended Complaint that supposedly demonstrate the "commingled" nature of Adoption Alliance's relationship with the state of Colorado. Specifically, Plaintiff points to allegations regarding Adoption Alliance, among other things,

> assuming Colorado's duty to review myriad documentation relating to Interstate Compact requests, [ECF No. 257,] Am. Compl. ¶ 25; [Adoption Alliance] assuming Colorado's duty to establish and adhere to follow-up procedures to ensure that requested/required post placement services are being provided in the receiving state (Colorado); *id.* ¶27 ; [Adoption Alliance] assuming the State's duty to maintain up-to-date knowledge regarding the laws, rules, and regulations that govern the Interstate Compact by reviewing the relevant statutes, rules, and regulations, as they are revised, by consultation with DHS staff, other states' Compact administrators, [Adoption Alliance] staff members, and by participation in several professional organizations, *id.* ¶28; [Adoption Alliance] agreeing to provide administrative review services required of the State of Colorado under state law, *id.* ¶31; [Adoption Alliance] entering into a contract (or contracts- with the

14

State of Colorado specifically providing for an ongoing, active role for the State of Colorado in monitoring [Adoption Alliance's] compliance with its contractual obligations, *id.* ¶ 33; [Adoption Alliance] establishing and maintaining at least 1,721 ICPC family files and 5,554 international family files pursuant to its contracts with the State since 1994, *id.* ¶ 36; and [Adoption Alliance] establishing and using an automated communication system that permitted the regular transfer of all ICPC adoption-related information between Defendant [Adoption Alliance] and the State of Colorado, *id.* ¶¶ 37-38.

(ECF No. 267 at 8.)

In *Gallagher*, applying the "symbiotic relationship" test, the Tenth Circuit found that when "the state 'has so far insinuated itself into a position of interdependence' with a private party 'it must be recognized as a joint participant in the challenged activity.'" 49 F.3d at 1451 (quoting *Burton*, 365 U.S. at 725).    The analysis in this test "starts by asking whether and to what extent the relationship with the private actor goes beyond the 'mere private [purchase] of contract services.'" *Wittner v. Banner Health*, 720 F.3d 770, 778 (10th Cir. 2013) (quoting *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n.*, 531 U.S. 288, 296 (2001)).

As the Tenth Circuit stated in *Gallagher*, there is no "bright-line rule" for determining when a symbiotic relationship exists between a private entity and the state, 49 F.3d at 1452, and indeed the Tenth Circuit's application of this doctrine has frequently turned on factual grounds. For example, in *Wittner*, the plaintiff had been brought to a private hospital by police and was placed on a 72 hour involuntary mental health hold and, during that involuntary hold, died as the result of medication administered to him by hospital staff.    720 F.3d at 771-3.    Holding that no symbiotic relationship had been established between the private hospital and the state, the Tenth Circuit found it determinative that the hospital in that case had a contract authorizing the acceptance of patients for involuntary holds of only 72 hours; allowed the hospital to accept or

15

reject patients at its discretion; did not involve extensive state participation in patient care; and did not involve the state's dictation of the medical program. *Id.* at 778-79.

In *Johnson*, 293 F.3d at 1202-06, the Tenth Circuit determined that the symbiotic relationship test was not met as to a private adoption center where there was no evidence that the state had "insinuated itself into a position of long-term interdependence" with the adoption center and that "there was no close union between Utah and either of the private Appellees, and no interweaving between them and the state." *Johnson*, 293 F.3d 1196, 1204-05.

By contrast, in *Milonas v. Williams*, 691 F.2d 931, 940 (10th Cir. 1982), the Tenth Circuit found that a symbiotic relationship existed between the state and a private school for behaviorally challenged boys. In *Milonas*,

> members of the class were placed at the school involuntarily by juvenile courts and other state agencies . . . . Detailed contracts were drawn up by the school administrators and agreed to by the many local school districts that placed boys at the school. There was significant state funding of tuition and, in fact, the school itself promoted the availability of public school funding . . . . There was extensive state regulation of the educational program. . . .

*Id.* Further, students could be placed in the school by order of state courts. *Id.* The Tenth Circuit noted that it was not merely a school, but also a "correctional and detention facility." *Id.* at 935.

Despite the lack of any bright line rule, the Tenth Circuit has opined that "extensive state regulation, the receipt of substantial state funds, and the performance of important public functions do not necessarily establish the kind of symbiotic relationship between the government and a private entity that is required for state action." *Gallagher,* 49 F.3d at 1451. Likewise, the fact that a heavily regulated, privately owned entity engaged in a "challenged action" in a manner

16

"permissible under state law" is not sufficient to cause that action to be attributable to the state. *Wittner*, 720 F.3d at 779.   "But a public-private relationship can transcend that of mere client and contractor if the private and public actors have sufficiently commingled their responsibilities." *Id.* at 778.

Even when construed liberally in Plaintiff's favor, the Amended Complaint does not allege facts sufficient to demonstrate or suggest that the state of Colorado participated in, coerced, or significantly encouraged any actions on the part of Adoption Alliance, Tem or Little.   Although Plaintiff offers numerous factual allegations in an effort to demonstrate that the relationship between the state of Colorado and Adoption Alliance was commingled, at the end these allegations do no more than provide an in-depth description of Adoption Alliance's contractual obligations under its agreement with the state and the Colorado statutes that regulate Adoption Alliance's business conduct.   As the above-cited case law makes clear, the existence of a contract with the state is insufficient to support the existence of a symbiotic relationship.   *Gallagher*, 49 F.3d at 1451; *Freeman v. Arapahoe House*, 13-cv-0064-WJM-MJW, 2014 WL 3864307, at *6 ("it is well established that government contracts . . . do not establish a symbiotic relationship").   Likewise, being the subject of extensive state regulation, receiving state funds, and the performance of important public functions does not necessarily establish a symbiotic relationship.   *Id.*; *Wittner*, 720 F.3d at 779.   Similar to the Defendants in *Wittner* and *Johnson*, Adoption Alliance is a private entity with a state contract and subject to state-imposed regulations in how it conducts its business. Such a relationship, without more, is not sufficient to show that the state of Colorado "has so far insinuated itself into a position of interdependence" with Adoption Alliance that "it must be

17

recognized as a joint participant in the challenged activity." *Gallagher*, 49 F.3d at 1451 (quoting *Burton*, 365 U.S. at 725).   Plaintiff has not alleged sufficient facts to state a cause of action under § 1983 against Adoption Alliance, Little or Tem under a symbiotic relationship theory.

Finally, Plaintiff argues that, due to the fact-intensive nature of the state action inquiry, it would be inappropriate to dismiss Plaintiff's claims under this doctrine at this early stage in the proceedings before full discovery has been conducted.   However, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must be dismissed if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.*, 550 U.S. at 570.   Here, even assuming all factual inferences in Plaintiff's favor, the allegations in his Amended Complaint are still not "enough to raise a right to relief above the speculative level." *Id.* at 555; *Ashcroft*, 556 U.S. at 678 ("A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do.   Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (internal quotation marks and citation omitted).   Because Plaintiff's allegations against Adoption Alliance, Little and Tem are insufficient to state a claim for relief that is plausible on its face under § 1983, Plaintiff's claims as to those Defendants under the special relationship doctrine, state created danger doctrine, and failure to train or supervise are dismissed.

## B. Plaintiff's § 1983 Claims against Amedei and Cramer

### 1. Danger Creation and Special Relationship Theories of Liability

In their motion to dismiss, Defendants Amedei and Cramer argue that they cannot be held liable under § 1983 because Plaintiff's harms were inflicted by Lovato, not the state.   "Generally,

18

state actors are liable under the Due Process Clause only for their own actions and not the actions

of private citizens." *Johnson ex rel. Estate of Cano v. Holmes*, 455 F.3d 1133, 1141 (10th Cir.

2006) (citing *Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995)).   There are two exceptions to

this rule – state officials may be subject to liability under § 1983 for the conduct of private actors if

they "(1) create a danger that results in a harm to an individual, even if that harm is not ultimately

inflicted by a state official; or (2) if the state has a 'special relationship' with the individual who is

harmed by the third party."   *Id.*   In addition to Plaintiff's state tort claims, Plaintiff has asserted §

1983 violations against Amedei and Cramer under both the "danger creation" and "special

relationship" doctrines.   As explained below, the Court finds that Plaintiff has stated a cause of

action against Amedei and Cramer under § 1983 based on the special relationship doctrine.

### a. *Special Relationship Liability*

The special relationship doctrine was first recognized in *Deshaney v. Winnebago County*

*Department of Social Services*, where the Supreme Court held that "when the State takes a person

into its custody and holds him there against his will, the Constitution imposes upon it a

corresponding duty to assume some responsibility for his safety and general well-being."   489

U.S. 189, 199-200 (1989).   That responsibility would include the provision of that individual's

"basic human needs—*e.g.*, food, clothing, shelter, medical care, and reasonable safety."   *Id.* at

200.   The Supreme Court found this duty to be triggered by

> the State's affirmative act of restraining the individual's freedom to act on his own
> behalf—through incarceration, institutionalization, or other similar restraint of
> personal liberty—which is the "deprivation of liberty" triggering the protections of
> the Due Process Clause, not its failure to act to protect his liberty interests against
> harm inflicted by other means.

19

*Id.*

   This doctrine was applied to the context of foster care by the Tenth Circuit for the first time

in *Yvonne L. ex rel. Lewis v. New Mexico Department of Human Services*.   959 F.2d 883 (10th

Cir. 1992).   There, the Tenth Circuit asserted that "children in the custody of a state [have] a

constitutional right to be reasonably safe from harm; and that if the persons responsible place

children in a foster home or institution that they know or suspect to be dangerous to the children

they incur liability if the harm occurs."   *Id.* at 893.   "Accordingly, foster care is recognized as

one of the custodial relationships that creates a special relationship."   *Schwartz v. Booker*, 702

F.3d 573, 580 (10th Cir. 2012).   "Generally, the scope of this relationship has turned on the

dependent and involuntary nature of the custodial relationship between the individual and the

State."   *Id.* at 580.   As such, "this right extends beyond initial placement to 'protection while in

foster care.'"   *Schwartz*, 702 F.3d at 581 n.6 (quoting *Yvonne L.*, 959 F.2d at 892-93).

   The right established in *Deshaney* has also been extended to the foster care context in other

circuits.   *See, e.g. Doe v. New York City Dep't of Social Servs.*, 649 F.2d 134, 141 (2d Cir. 1981)

(holding that a child in state custody has a constitutional right not to be placed in a foster care

setting known to be unsafe); *Taylor ex rel. Walker v. Ledbetter*, 818 F.2d 791, 797 (11th Cir. 1987)

(en banc) (holding "that a child involuntarily placed in a foster home is in a situation so analogous

to a prisoner in a penal institution and a child confined in a mental health facility that the foster

child may bring a section 1983 action for violation of fourteenth amendment rights."); *K.H. ex rel.*

*Murphy v. Morgan*, 914 F.2d 846, 853 (7th Cir. 1990) (finding a constitutional "right not to be

placed with a foster parent who the state's caseworkers and supervisors know or suspect is likely to

abuse or neglect the foster child").

In order to state a plausible claim against a state actor under a special relationship theory, a plaintiff must allege facts showing (1) that a custodial relationship existed, *DeShaney*, 489 U.S. at 197, (2) that the state official either "knew of an asserted danger to [the individual in custody] or failed to exercise professional judgment with respect thereto," and (3) that "an affirmative link between the injuries [the child] suffered can be shown." *Schwartz*, 702 F.3d at 580 (quoting *Yvonne L.*, 959 F.2d at 890); *see also Bishop v. Oklahoma ex rel Dept of Human Servs.*, No. civ-13-171-D., 2013 WL 6192516 at *3 (W.D. Okla. Nov. 26, 2013).

Amedei and Cramer argue that the first element of the special relationship test is not satisfied in this case because Plaintiff has not sufficiently alleged that he was in these Defendants' custody.   Amedei and Cramer argue that the critical component of the custodial relationship requirement is the determination of who *initially* placed the individual into the state's custody. These Defendants contend that this component of the special relationship test is not met because the Amended Complaint "nowhere alleges the [Moffat County] DSS engaged in any affirmative act to restrain Plaintiff's freedom to act on his own behalf, through incarceration, institutionalization, or other similar restraint of personal liberty."   (ECF No. 216 at 9.)   Because of these pleading deficiencies, so argue Amedie and Cramer, Plaintiff has not sufficiently alleged a special relationship with these Defendants because that theory "applies only to the entity who removes the child from their home, places them in a dangerous situation, and remains responsible for their basic human needs . . . ."   (*Id.* at 11.)

However, reviewing Tenth Circuit case law and the decisions of courts in other circuits

regarding the custodial relationship requirement, it appears that this element of the special

relationship cause of action does not turn on who or what state entity *initially created* the custodial

relationship, but rather whether the individual seeking recovery was under the *involuntary* custody

of that state entity or not.   *See Uhlrig*, 64 F.3d at 572 (special relationship theory was

"inapplicable" to case where psychiatric professional had been murdered by a patient because

decedent was "simply an employee of the state working at the Topeka State Hospital, and an

employment relationship is consensual in nature"); *Liebson v. New Mexico Corrections Dep't*, 73

F.3d 274, 276 (10th Cir. 1996) (librarian who was sexually assaulted while working in a prison

failed to show the existence of a special relationship because her employment was voluntary).

Alternatively, courts have also found the existence or absence of state custody to turn on the

whether the plaintiff was in the custody of the state in the first instance, as opposed to being in the

custody of a private individual.   *See Deschaney*, 489 U.S. at 201 (no special relationship liability

where decedent child was injured while in the legal custody of his natural father—a private

actor—and not the state); *Pierce v. Delta Cnty. Dept. of Soc. Servs.*, 119 F.Supp.2d 1139 (D. Colo.

2000) (same); *Maldonado v. Josey*, 975 F.2d 727, 730-33 (10th Cir. 1992) (no special relationship

established between student and public elementary school officials as a result of "compulsory

attendance laws" requiring student's attendance because those "compulsory education laws do not

change the fact that the parents are the primary caretakers of the students; those same parents—and

not the state—must determine and address the basic needs that each child has"); *J.O. v. Alton

Community Unit Sch. Dist. 11*, 909 F.2d 267, 272 (7th Cir. 1990) (no special relationship

established by compulsory school attendance laws because school children, unlike prisoners and

mental patients, are able to provide for their basic human needs and "parents still retain primary responsibility for feeding, clothing, sheltering, and caring for the child"); *D.R. v. Middle Bucks Area Vocational Technical Sch.*, 972 F.2d 1364, 1372 (3d Cir. 1992) (en banc) (same).

　　While the above cited cases clearly demonstrate that courts will not find that the custodial relationship element satisfied where the plaintiff is not in the custody of the state or where such custody is not involuntary, Defendants have not cited a single case where a court held that a special relationship could not be established between an individual plaintiff and a state actor because that state actor or organization was not involved in the initial act of placing the plaintiff into custody. Nor has this Court found any such cases upon its own review.   Indeed, the Tenth Circuit has faced an argument similar to that offered by Defendants and has squarely rejected it.   *Schwartz*, 702 F.3d at 584.   In *Schwartz*, the Tenth Circuit affirmed the denial of a motion to dismiss claims against two social workers who were involved in the care of a seven-year old child who ultimately perished while in foster care.   The decedent in that case had spent nearly three years in social services, over which time three Colorado County departments of human services were called upon to investigate instances of reported abuse.   None of the social services employees acted on those reports and the decedent ultimately died at the home of his foster parents of starvation and dehydration.   *Id.* at 576-78.   The named defendants in that case were two of the individual social workers assigned to monitor the decedent's foster care.   As in the present case, the defendants in *Schwartz* were not associated with the social services agency that initially placed the decedent into foster care but only became involved with the monitoring of the decedent's foster care when his family was relocated out of the Jefferson County Department of Human Services ("JCDHS")

23

jurisdiction and into the jurisdiction of the Denver County Department of Human Services ("DCDHS").   The defendants there, as here, argued that DCDHS therefore "neither had a custodial relationship with [the decedent] nor restricted [the decedent's] freedom sufficient to deprive him of liberty" because JCDHS, not DCDHS, was the entity that took the initial act of placing the decedent into foster care.   *Id.*at 581.

Rejecting this argument, the Tenth Circuit found that the following factual connections between the decedent and DCDHS were sufficient to establish that a special relationship had arisen upon DCDHS assuming responsibility for the monitoring of the decedent's foster placement:

> During the period relevant here, [the decedent] lived with his foster parents in and attended school in Denver County.   By January 20, at the latest, DCDHS accepted responsibility for [the decedent] by investigating responses to alleged abuse, after his removal from Jon Phillips's home, and subsequently placing [the decedent] back in Jon Phillips's home in Denver County.

*Id.* at 584-85.   Based on these actions, the Tenth Circuit concluded that "DCDHS effectively exercised custody over [the decedent]."   *Id.* at 585.   "To conclude otherwise," the Tenth Circuit found, "would artificially constrain the doctrine beyond reason."   *Id.*; *see also J.R. v. Gloria*, 593 F.3d 73, 76, 80 (1st Cir. 2010) (applying doctrine to state actors who were not involved in initial placement of child because social services "affirmatively took responsibility for protecting the twins from harm while they remained in foster care" but finding that conduct did not shock the conscience); *Waubanascum v. Shawano Cnty.*, 416 F.3d 658, 665-66 (7th Cir. 2005) (county overseeing foster child's case and investigating reports of abuse "had custody," as opposed to the county where child's home was located and that issued a courtesy license regarding child's foster

24

placement).

Contrary to Amedei and Cramer's contention that the creation of the custodial relationship is all that matters to the determination of whether the individual is in custody, the Tenth Circuit in *Schwartz* instead found that the "scope of this relationship has turned on the *dependent and involuntary nature* of the custodial relationship between the individual and the State." 702 F.3d at 580 (emphasis added). In other words, it was the nature of the relationship as it existed between the state and the plaintiff that mattered, not the specific facts surrounding its creation. *Id.*; *see also MAP v. Bd. of Trs. for Colo. Sch. for the Deaf & Blind*, No. 12-cv-062666-RM-KLM, 2014 WL 3748642, at *8 (D. Colo. Apr. 28, 2014) (reviewing the Tenth Circuit's holding in *Schwartz* and concluding that, for establishing the existence of a special relationship "[t]he key issue appears to be whether the State or a private citizen holds the 'ultimate responsibility' for a person's basic welfare."). Complementing this finding, the Tenth Circuit recognized the troubling consequences that might follow if it were to hold liable only the individuals responsible for a child's initial placement into foster care:

> Who would be constitutionally liable for protecting the foster child if the placing individual dies? Would the placing individual be constitutionally liable for overseeing the foster child even after she left DHS employment? Thankfully, we need not entertain such questions because . . . we do not view the special relationship doctrine so narrowly.

*Schwartz*, 702 F.3d at 583.

The facts in *Schwartz* align closely with the facts alleged in Plaintiff's Amended Complaint. Importantly, many of the Amended Complaint's allegations regarding the acts of Amedei and Cramer are alleged to have occurred before Lovato received legal custody of Plaintiff

25

in December, 2008.   (ECF No. 257 at ¶¶ 46, 82, 87-88, 91-96, 98-105, 130-38, 162.)   Plaintiff

was in state legal custody during the relevant time prior to the finalization of his adoption by

Lovato, and during that time, as alleged in the Amended Complaint, the Moffat County DSS was

the state agency in Colorado responsible for investigating and reporting any signs or allegations of

abuse.   (*Id.* at ¶¶ 46, 83-84, 138.)   As alleged by Plaintiff, when school personnel reported their

concerns that Plaintiff was being abused, Moffat County DSS was the investigating county and

Amedei and Cramer were the social workers whom these concerns were reported to and who

attempted to investigate the matter.   (ECF No. 257 at ¶¶ 93, 97, 101, 103, 141.)   In addition, as

alleged, Amedei and Cramer had the legal authority at this time to take action and have Plaintiff

removed from Lovato's physical custody, which action they are alleged to have refrained from

taking.   (*Id.*at ¶¶ 91-92, 162; *see also* C.R.S. § 19-3-405.)   It is alleged that Craig police officer

Secules contacted the Moffat County DSS, not any Oklahoma state entity, to report his suspicions

that Plaintiff was being abused.   (*Id.* at ¶¶ 130, 132.)   Amedei and Cramer responded by

assuming responsibility for investigating this report.   (*Id.* at ¶¶ 130-37.)

Plaintiff acknowledges that, until his adoption was finalized with Lovato, he was

"technically in Oklahoma's legal custody."   (ECF No. 267 at 15.)   However, the case law

reviewed above shows that the determination as to who has "custody" for purposes of the special

relationship doctrine turns not only on legal formalities and the documentation surrounding the

ward's foster care, but rather what type of actual, literal control state actors exercised over the

ward and what steps those state actors took to supervise the ward's safety.   *Schwartz*, 702 F.3d at

584-86; *J.R. v. Gloria*, 593 F.3d at 80 (social services had custody over wards because they

"affirmatively took responsibility for protecting the twins from harm while they remained in foster care"); *Waubanascum*, 416 F.3d at 665-66 (7th Cir. 2005) (county had custody over plaintiff because, among other reasons, it "monitored [plaintiff] under its highest level of supervision during the time he was placed in his [foster parent's] home").   By their acts, as alleged in the Amended Complaint, Amedei and Cramer "accepted responsibility for [Plaintiff] by investigating responses to alleged abuse . . . ." *Schwartz*, 702 F.3d at 584-85.   "Accordingly, [Moffat County DSS] effectively exercised custody over [Plaintiff]," and by extension Amedei and Cramer.  *Id.*[1]

Further, the cases cited by Amedei and Cramer do not stand for the proposition that these Defendants assert.   In *DeShaney*, the Supreme Court found that a child was not in a special relationship with Wisconsin state social workers because the harms he suffered "occurred not while he was in the State's custody, but while he was in the custody of his natural father, who was in no sense a state actor."   489 U.S. at 201.   Here, it is not disputed by any party that Plaintiff was not in Lovato's legal custody, but rather was a ward of the state and had been injured as a result of being placed into foster care with Lovato.   Likewise, the Tenth Circuit in *Deanzona* found that a special relationship had not been established in that case because the child's biological mother was still the child's primary caregiver and the child "was not in the custody of the state."  *Deanzona v. City & Cnty. of Denver*, 222 F.3d 1229, 1234 (10th Cir. 2000).   No one in this case argues that

---

[1]The Moffat County DSS had a statutory duty to look after the best interest of a foster child.   Colo. Rev. Stat. § 19-1-102(1)(c) (purpose of Children's Code is ultimately "for the courts to proceed with all possible speed to a legal determination that will serve the best interests of the child").   Amedei and Cramer's argument that they had "no responsibility for monitoring [Plaintiff's] placement" is belied by this statutory regime and also contradicted by the facts alleged in Plaintiff's Amended Complaint, which this Court is bound to consider as true for the purposes of the present motion.

Plaintiff was in the legal custody of Lovato or any other private actor at the time that at least some of his alleged injuries were inflicted – the holding in *Deanzona* is therefore inapposite.   While the Tenth Circuit in *Yvonne L.* did find that a special relationship attached to state actors where the individual defendants had taken the affirmative act of placing the plaintiffs into foster care, nowhere in that case did the Tenth Circuit face the issue of whether special relationship liability could attach *only* as to defendants who had taken the *initial* act of taking the individual into state custody, or whether it could be extended to others who assumed that custody later on.   Put simply, none of the cases relied on by Amedei and Cramer can be read to say that special relationship liability can only be placed on the individuals, state or entity that made the initial move to place an individual into custody.

Amedei and Cramer also argue that Plaintiff has failed to allege facts sufficient to show the second element of a special relationship claim, that these Defendants failed to exercise professional judgment.   The Tenth Circuit has found that the professional judgment element requires allegations of "more than mere negligence: it requires an abdication of such professional responsibility," and " '[s]uch abdication must be sufficient to shock the conscience.'"   *J.W. v. Utah*, 647 F.3d 1006, 1011 (10th Cir. 2011) (quoting *Johnson ex rel. Estate of Cano,* 455 F.3d at 1143).   "Conduct is shocking to the conscience when the degree of outrageousness and magnitude of potential or actual harm is truly conscience shocking."   *Schwartz*, 702 F.3d at 586 (modifications and citations omitted).   However, it should be noted that the Tenth Circuit has determined that a plaintiff's rights associated with this relationship should be interpreted more broadly in the context of foster care children than as applied to prisoners; that because "foster

28

children, like involuntarily committed patients, are entitled to more considerate treatment and conditions than criminals, it seems incongruous that the protection extended to foster children would be so limited . . . ." *Id.* at 582 (internal quotations and citations omitted); *see also Hatfield v. O'Neill*, 534 F. App'x. 838, 847 (11th Cir. 2013) ("The conscience-shocking threshold is more quickly reached in cases where the victim is particularly vulnerable to abuse and is otherwise defenseless.") (internal citations and quotation marks omitted).

The facts as alleged in the Amended Complaint are sufficient, at this stage in the litigation, to plausibly suggest that the acts of Amedie and Cramer deviated sufficiently from any standards of professional responsibility such that they could be said to shock the conscience.   The Amended Complaint alleges that around September 16, 2008, school officials contacted Moffat County DSS reporting that Plaintiff had missed the first two weeks of school, had arrived with the remnants of a black eye, had lost over twenty-five pounds, and was exhibiting a marked change in behavior, becoming increasingly withdrawn and defensive.   (ECF No. 257 at ¶¶ 80-105.)   After conducting a meeting with Plaintiff and his school counselor, and then speaking with Lovato over the phone, Defendants Amedei and Cramer decided that no further action was necessary.   (*Id.* at ¶¶93-99.) School officials contacted Moffat County DSS again on September 24, 2008, reporting that Dahn had come to school with additional bruises on his right bicep and right forearm.   (*Id.*at ¶101.)   It is also alleged that, by this time, Moffat County DSS "had received several emails from teachers concerned for the child."   (*Id.* at ¶ 103.)   Cramer, who was allegedly responsible for this second report of abuse, determined that no further action was necessary beyond speaking with the school health technician.   (*Id.* at ¶¶ 103-105.)   In December, 2008, Officer Dale Secules of the Craig

29

Police Department responded to a call from Plaintiff's school reporting a new bruise on Dahn's eye.  (*Id.* at ¶130.)   Plaintiff alleges that Amedei became defensive when Officer Dale contacted her regarding the suspected abuse, challenging his jurisdiction to investigate the issue and "berating" him for overreacting.   (*Id.* at ¶¶ 133-35.)   It is alleged that Amedei and Cramer chose not to take any action in response to this report from Officer Secules.   (*Id.* at ¶¶ 135-37.)

Taking the allegations in the Amended Complaint as true and granting all inferences in Plaintiff's favor, as this Court is bound to do at this stage in the proceedings, it appears that Amedei and Cramer were confronted multiple times with information indicating a high probability that Plaintiff was being subject to abuse at the hands of Lovato, yet took no action to remove Plaintiff from Lovato's home or otherwise protect Plaintiff.   The Amended Complaint makes sufficient allegations to show, when granting all reasonable inferences in Plaintiff's favor, that Amedei and Cramer's conduct in responding to reports from school officials and police were in such derogation of traditional standards of professional judgment that it could be said to shock the conscience.   Based on the foregoing, the Court denies Amedei and Cramer's motion to dismiss Plaintiff's § 1983 claim against them based on the special relationship doctrine.

### b. *State Created Danger*

Building on the Supreme Court's decision in *DeShaney*, the Tenth Circuit recognized for the first time in *Graham v. Independent School District No. I-89*, 22 F.3d 991, 995 (10th Cir. 1994) that state actors can be held liable for taking "affirmative actions which created or increased the danger to the plaintiffs."   This theory of liability was acknowledged in subsequent decisions, and the doctrine now stands that "state officials can be liable for the acts of third parties where those

officials 'created the danger' that caused the harm."   *Seamons v. Snow*, 84 F.3d 1226, 1236 (10th

Cir. 1996) (quoting *Uhlrig,* 64 F.3d at 572).   Labeled the "danger creation" cause of action, a

plaintiff must allege the following elements in order to bring a claim against state actors under this

theory:

> (1) the charged state entity and the charged individual actors created the danger or
> increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a
> member of a limited and specifically definable group; (3) defendants' conduct put
> plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk
> was obvious or known; (5) defendant acted recklessly in conscious disregard of that
> risk; and (6) such conduct, when viewed in total, is conscience shocking.

*Currier v. Doran*, 242 F.3d 905, 918 (10th Cir. 2001) (citing *Armijo v. Wagon Mound Pub. Sch.*,

159 F.3d 1253, 1260 (10th Cir. 1998).   The Tenth Circuit has enumerated three principles that

courts are advised to consider when evaluating substantive due process claims, which it has

specifically employed in the context of a danger creation claim: "(1) the general need for restraint;

(2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policy

decisions impacting public safety."   *Id.* at 920 (citing *Uhlrig,* 64 F.3d at 573).

One of the fundamental tenants of this doctrine is that, in order to hold state actors liable for

the harm inflicted by a third party, they must have engaged in "affirmative conduct" that

effectively "plac[es] the plaintiff in danger."   *Graham*, 22 F.3d at 995 (citation omitted); *Armijo*,

149 F.3d at 1263 ("The key to the state-created danger cases . . . lies in the state actors' culpable

knowledge and conduct in affirmatively placing an individual in a position of danger, effectively

stripping a person of her ability to defend herself, or cutting off potential sources of private aid.")

(quoting *Johnson v. Dallas Indep. Sch. Dist.*, 38 F.3d 198, 201 (5th Cir. 1994)); *Estate of B.I.C. v.*

*Gillen*, 710 F.3d 1168, 1174 (10th Cir. 2013) ("As an initial matter, a showing of affirmative

conduct and private violence are preconditions necessary to invoking the state-created danger theory.") (citing *Gray v. Univ. Colo. Hosp. Auth.*, 672 F.3d 909, 920 n.8 (10th Cir. 2012)). Indeed, " '[i]naction by the state in the face of a known danger is not enough to trigger the obligation' unless the State has 'limited in some way the liberty of a citizen to act on his own behalf.'"   *Gray*, 672 F.3d at 916-17 (quoting *Graham*, 22 F.3d at 955).

For example, in *Briggs v. Johnson*, where the representative for the estate of a deceased child brought suit against department of human services employees who had been responsible for the child's care, the Tenth Circuit found that the plaintiff had sufficiently alleged that those employees had engaged in affirmative conduct where they were alleged to have "discouraged the reporting of abuse."   274 Fed. App'x 730, 735 (10th Cir. 2008).   The court in that case found that the act of discouraging was sufficient to trigger affirmative conduct:

> Admittedly, the allegation that Defendants discouraged the reporting of abuse *could* be construed to describe both action and inaction.   Defendants may have specifically directed individuals interested in Kelsey's welfare to cease reporting abuse *or* their inaction in responding to repeated reports may have had the effect of discouraging those individuals from continuing to report abuse. . . . .   Even in the absence of the required inference [given to the non-movant on a motion to dismiss], the natural and obvious interpretation of Briggs's allegation, read in context, is that Defendants affirmatively discouraged the reporting of abuse.

*Id.* (emphasis in original).

Similarly, in *Currier v. Doran*, the Tenth Circuit found that the plaintiff had sufficiently alleged affirmative conduct on the part of a defendant social worker who had "instructed" a foster child's mother "to stop making allegations of abuse."   242 F.3d at 921.   In that case, the state of New Mexico had removed two young children from the custody of their mother and placed them in the custody of their father, who subsequently abused and ultimately killed one of the children.   *Id.*

32

at 909-10.   The Tenth Circuit found that the plaintiffs had sufficiently alleged affirmative conduct against a state social worker who had told the children's mother to stop reporting incidents of abuse, as that alleged conduct "interfere[d] with the protective services which would have otherwise been available" to the children; that "the state creates danger when it cuts off potential sources of private aid."   *Id.* at 922.   "Although [the social worker] was constitutionally free to ignore the pleas of [the children's mother] and offer no assistance, her behavior allegedly discouraged [the mother] from seeking the help of other CYF employees or other governmental sources of help such as the police."   *Id.*

Plaintiff argues that he has alleged several affirmative acts and decision taken by Amedei and Cramer that would give rise to a danger creation claim, including

> Defendants' affirmative decisions to challenge police Secules' jurisdiction to respond to reports of abuse by his teachers, Defendants' affirmative decisions to actively thwart the concerned teachers who would have otherwise served as safety vales [sic] or potential sources of private aid to their pupil James Dahn, Defendants' affirmative decisions to make deficient investigations including choosing not to photograph injuries, and Defendants' affirmative decisions to fail to timely respond to and to otherwise affirmatively disregard credible reports that James was being abused.

(ECF No. 267 at 29-30; *see also* ECF No. 229 at 20.)

Taking the allegations in the Amended Complaint as true, and allowing all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff has not sufficiently alleged affirmative conduct by Amedei or Cramer sufficient to subject them to state created danger liability.   The central premise of Plaintiff's claims against Amedei and Cramer are that they were confronted, on multiple occasions, with what appear from the Amended Complaint to be obvious signs that Plaintiff was being abused by Lovato yet *did nothing* to remove Plaintiff from this situation.   In

33

other words, the crux of Plaintiff's argument against these Defendants is that they failed to take

action, not that they engaged in any affirmative conduct that placed Plaintiff in harm's way.

Although, as Plaintiff puts it, Amedei and Cramer allegedly made "affirmative decisions to

actively thwart the concerned teachers," (ECF No. 267 at 29-30), ostensibly by not making

adequate responses to those teachers' complaints, the affirmative decision not to respond is not

sufficient to create affirmative conduct, and indeed these Defendants were "constitutionally free to

ignore the pleas of" Plaintiff's concerned teachers.   *Currier*, 242 F.3d 922.   Further, the

Amended Complaint contains no allegations that either Amedei or Cramer made any statements to

any of Plaintiff's teachers discouraging them from making further reports of suspected abuse, and

indeed the Amended Complaint chronicles repeated reports made by Plaintiff's teachers that

continued even after Plaintiff's adoption was finalized.

In that same vein, Amedei and Cramer were likewise not engaged in "affirmative conduct,"

as that term has been defined in the context of the state created danger doctrine by the Tenth

Circuit, when these Defendants made "affirmative decisions to make deficient investigations . . . ."

(ECF No. 267 at 29-30.)   The Tenth Circuit has made clear that "'[i]naction by the state in the face

of a known danger is not enough to trigger the obligation' unless the State has 'limited in some

way the liberty of a citizen to act on his own behalf.'"   *Gray*, 672 F.3d at 916-17 (10th Cir. 2012)

(quoting *Graham*, 22 F.3d at 955).   Amedei and Cramer's alleged "affirmative decisions to fail to

timely respond to and otherwise affirmatively disregard credible reports that James was being

abused" is similarly insufficient to qualify as affirmative conduct for purposes of the state created

danger doctrine.

34

Plaintiff argues that he has alleged at least one affirmative act on the part of Amedei and Cramer that go beyond an affirmative decision not to act: that both Defendants actively discouraged Officer Secules from pursuing further investigation of his suspicions that Plaintiff was being mistreated by Lovato.   In so doing, Plaintiff attempts to align the allegations in the Amended Complaint with the facts before the Tenth Circuit in *Currier* and *Briggs*, where state actors were found to have engaged in affirmative action by discouraging others to pursue their concerns regarding the potential abuse of a foster child.   However, a close reading of the Amended Complaint does not actually bear out Plaintiff's contention that either Amedei or Cramer took any acts that might cause Officer Secules to be less likely to report his concerns or pursue his own investigation.   While it does appear that Amedei may have made *disparaging* remarks about Officer Secules' interest in Plaintiff's safety, nowhere does it allege that Amedei made any remarks that affirmatively *discouraged* him from pursuing his concerns, and Cramer is not even mentioned as having any interaction with Officer Secules.   (*See* ECF No. 257 ¶¶ 130-37.)

Because Plaintiff fails to allege any facts indicating that Amedei and Cramer took any affirmative acts that tended to increase Plaintiff's risk of harm at the hands of a private actor, his claim under the danger creation theory fails and is dismissed.

### 2. Failure to Train

As to Plaintiff's claim against Amedei based on her alleged failure to train and supervise Cramer, this claim is inadequately pled and must be dismissed.   The Tenth Circuit has made clear that "[j]ust as § 1983's plain language doesn't authorize strict liability, it doesn't authorize *respondeat superior* liability." *Porro v. Barnes*, 624 F.3d 1322, 1327 (10th Cir. 2010).   In *Dodds*

35

*v. Richardson*, 614 F.3d 1185 (10th Cir. 2010), *cert denied*, 563 U.S. 960 (2011), the Tenth Circuit

stated that "§ 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates,

promulgates, implements, or in some other way possesses responsibility for the continued

operation of a policy the enforcement (the defendant-supervisor or her subordinates) of which

subjects, or causes to be subjected that plaintiff to the deprivation of any rights secured by the

Constitution." *Id.* at 1199 (citations and quotations omitted).   The Tenth Circuit further

elaborated that, in order to succeed in a § 1983 suit against a defendant-supervisor, a plaintiff must

prove the following:

> (1) the defendant promulgated, created, implemented or possessed responsibility
> for the continued operation of a policy that (2) caused the complained of
> constitutional harm, and (3) acted with the state of mind required to establish the
> alleged constitutional deprivation.

*Id.* at 1199-1200 (citing *Summum v. City of Ogden*, 297 F.3d 995, 1000 (10th Cir. 2002)).   As with

any other § 1983 claim, "the plaintiff must establish a deliberate, intentional act on the part of the

defendant to violate the plaintiff's legal rights."   *Porro*, 624 F.3d at 1327-28 (citations, quotations

and alterations omitted).

The standard for imposing supervisor liability also appears to have been refined as a result

of the Supreme Court's decision in *Ashcroft v. Iqbal*.   Acknowledging the refinement of

supervisor liability following this decision from the Supreme Court, the Tenth Circuit in *Schneider*

*v. City of Grand Junction Police Dept.*, stated that "[b]ecause vicarious liability is inapplicable to .

. . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the

official's own individual actions, has violated the Constitution."   717 F.3d 760, 768 (10th Cir.

2013) (quoting *Ashcroft*, 556 U.S. at 676); *see also Dodds*, 614 F.3d at 1199 ("Whatever else can

36

be said about *Iqbal*, and certainly much can be said, we conclude the following basis of § 1983

liability survived it . . . : §1983 allows a plaintiff to impose liability upon a defendant-supervisor

who creates, promulgates, implements, or in some other way possesses responsibility for the

continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates)

of which 'subjects, or causes to be subjected' that plaintiff 'to the deprivation of any rights . . .

secured by the Constitution . . . .'") (quoting 42 U.S.C. § 1983).   "Simply put, there's no special

rule of liability for supervisors.   The test for them is the same as the test for everyone else."

*Porro*, 624 F.3d at 1328.   Courts within this district have applied the *Dodds* test in the specific

context of a claim that the supervisor failed to train his or her subordinate.   *Kemp v. Lawyer*, 846

F.Supp.2d 1170 (D. Colo. 2012) (no failure-to-train § 1983 liability where plaintiff's allegations

amounted to mere speculation that police officers under defendant sheriff's supervision habitually

engaged in warrantless searches and seizures); *Myers v. Koopman*, No. 09-cv-02802-REB-MEH,

2011 WL 650328 (D. Colo. Feb. 11, 2011).

     As to the first element of his failure to train/supervise claim, Plaintiff has not alleged any

facts indicating that Amedei was responsible for the promulgation or implementation of any policy

relating to any of the alleged actions or inactions that led to Plaintiff's claimed injuries.   *See Pahls*

*v. Thomas*, 718 F.3d 1210, 1226 (10th Cir. 2013) ("A plaintiff must . . . identify the specific

policies over which particular defendants possessed responsibility and that led to the alleged

constitutional violations.").   Although Plaintiff argues that he has alleged numerous facts that

would establish this point, none of Plaintiff's cited allegations makes mention of Amedei's

responsibility for the promulgation or implementation of any policy under which Cramer acted.

Because Plaintiff has not alleged that Amedei was in any position to promulgate or implement any policies, or even allege that a particular policy led to Plaintiff's harms, the other two elements of Plaintiff's failure to train/supervise claim also must fail.   This claim is therefore dismissed.

### 3. Official Capacity Claims

Amedei and Cramer argue that Plaintiff's official capacity claims against them are barred by the Eleventh Amendment, which prohibits suits against states.   Typically, when a plaintiff sues a state actor in his or her official capacity, the suit is actually one against the state, and courts generally treat official capacity claims as tantamount to a claim "against an entity of which an officer is an agent."   *Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978); *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).   However, Plaintiff contends that he is not seeking monetary relief by his claims against these Defendants in their official capacities, which he concedes he would not be permitted to pursue, but rather is only suing these Defendants in their official capacities to obtain injunctive relief.   This is a relevant distinction, as "a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because official-capacity actions for prospective relief are not treated as actions against the State."   *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) (internal quotation marks and citation omitted).

Specifically, Plaintiff contends that he seeks only an equitable, injunctive remedy in the form of an apology.   (ECF No. 267 at 37.)   As is evident from the cases cited by the parties in their briefing (*see* ECF No. 267 at 37; ECF No. 285 at 39) and as acknowledged in the magistrate judge's Previous Recommendation (*see* ECF No. 158 at 7-8), there appears to be a split in

authority as to whether a federal district court may award equitable relief in the form of an apology.   *Compare Villescas v. Abraham*, 285 F.Supp.2d 1248, 1256 (D. Colo. 2003) (apology a permissible equitable remedy); *Wells v. Lobb & Co., Inc.*, Nos. Civ.A. 97-WM-1011, Civ.A. 97-WM-1317, Civ.A. 98-WM-279, 1999 WL 1268331 (D. Colo. Dec. 1, 1999) (ordering defendants to deliver letter of apology to plaintiff); *with Kitchen v. Essex Cnty. Correctional Facility*, No. 12-2199 (JLL), 2012 WL 1994505, at *4 (D.N.J. May 31, 2012) (apology not cognizable remedy "either within the meaning of a § 1983 action or as a general legal remedy"); *Norris v. Poole*, No. 8:10-750-JFA-BHH, 2010 WL 1903970, at *3 (D.S.C. Apr. 19, 2010) (apology only available "in extraordinary circumstances"); *Burkes v. Tranquilli*, No. 08-474, 2008 WL 2682606, at *4 (W.D. Pa. July 2, 2008) (apology not an appropriate remedy); *Woodruff v. Ohman*, 29 Fed.App'x. 337, 346 (6th Cir. 2002) ("the district court exceeded its equitable power when it ordered [defendant] to apologize"); *McKee v. Turner*, 491 F.2d 1106, 1107 (9th Cir. 1974) (noting court was "not commissioned to run around getting apologies"); *Rumbles v. Hill*, 182 F.3d 1064, 1066-67 (9th Cir. 1999), *overruled on other grounds by Booth v. Churner*, 532 U.S. 731 (2001) (district court correctly "held that it had no power to . . . compel a party to apologize.")

The Court finds more persuasive those cases finding that a court ordered apology is generally an inappropriate remedy.   The Court is not aware of any authority finding it appropriate to enjoin a party to submit an apology in connection with a plaintiff's § 1983 claim, yet the Court is cognizant of the constitutional implications attendant to enjoining a party to make statements that may run contrary to his or her beliefs.   And the fact that Plaintiff seeks an apology from these Defendants in their official capacities—which are typically entitled to Eleventh Amendment

protection—reinforces the Court's belief that this remedy should be available, if at all, only in

extraordinary circumstances. The Court finds that this remedy would be inappropriate in this

case, and that this Court is without power to order such remedy in the first instance. This holding

is bolstered by the Court's review of the Amended Complaint, which lacks any specific allegation

or request for an apology. Plaintiff's official capacity claims against Amedei and Cramer are

therefore dismissed.

### 4. Qualified Immunity

Amedei and Cramer argue that, even if they could be held liable under the special

relationship doctrine, these Defendants would be qualifiedly immune from suit. "The doctrine of

qualified immunity protects government officials from liability for civil damages insofar as their

conduct does not violate clearly established statutory or constitutional rights of which a reasonable

person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation

marks and citation omitted). To resolve a claim of qualified immunity, the Court must consider

two elements: (1) whether a constitutional violation occurred, and (2) whether the right violated

was "clearly established" at the time of the violation. *Id*. at 230-31. The Court may "exercise

[its] sound discretion in deciding which of the two prongs of the qualified immunity analysis

should be addressed first in light of the circumstances in the particular case at hand." *Id*. at 236;

*accord Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011). " 'Qualified immunity is

applicable unless' the plaintiff can satisfy both prongs of the inquiry." *Herrera v. City of

Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009) (quoting *Pearson*, 555 U.S. at 232).

In their response to Plaintiffs' objection to the Recommendation, Amedei and Cramer

argue that the first prong of this analysis is not satisfied by re-arguing why the special relationship and danger creation doctrines would not apply, and also why their conduct as alleged by Plaintiff would not be sufficient to shock the judicial conscience. However, as this Court has determined, Plaintiff has sufficiently alleged a cause of action against Amedei and Cramer involving the violation of Plaintiff's Fourteenth Amendment rights, pursuant to 28 U.S.C. § 1983, under the special relationship doctrine. The first prong of the qualified immunity test is therefore met, and the Court must only inquire as to whether the right Plaintiff alleges was violated was clearly established at the time that right was allegedly violated. The determination of whether such a right was clearly established "turns on the 'objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken.'" *Schwartz*, 702 F.3d at 587 (quoting *Pearson*, 555 U.S. at 244).

In *Schwartz*, the Tenth Circuit acknowledged that "case law has clearly established that foster children have a Fourteenth Amendment constitutional right to be reasonably safe while in the State's custody." 702 F.3d at 587 (citing *J.W.*, 647 F.3d at 1011; *Yvonne L.*, 959 F.2d at 892-93 ("Indeed, the constitutional right of foster children to be kept reasonably safe from harm has been clearly established since at least 1985.")). The Tenth Circuit in *Schwartz* went on state more specifically that "[s]ince 1985, case law in this circuit and the established weight of authority has clearly established that state officials could violate foster children's substantive due process rights if they knew of an asserted danger to a foster child or failed to exercise professional judgment with respect thereto." *Id.* at 588.

As acknowledged in *Schwartz*, the Tenth Circuit has clearly established the constitutional

41

right that Plaintiff claims was violated by Amedei and Cramer, and that such right was clearly established as early as 1985.   Thus, Amedei and Cramer are not entitled to qualified immunity as to these claims.

### C. Plaintiff's Colorado State Common Law and Statutory Claims for Relief

#### 1. State Tort Claims against Amedei and Cramer

Amedei and Cramer argue that they are immune from state tort claims, including Plaintiff's claim against them under Colorado common law and C.R.S. § 24-10-118 for "outrageous conduct," by virtue of the immunity from tort claims provided to state employees under the Colorado Governmental Immunity Act ("CGIA").   Specifically, Amedei and Cramer point to C.R.S. § 24-10-110(5)(a), which provides that "[i]n any action in which allegations are made that an act or omission of a public employee was willful and wanton, the specific factual basis of such allegations shall be stated in the complaint."   These Defendants also point to C.R.S. § 24-10-110(5)(b), which provides that the "[f]ailure to plead the factual basis of an allegation that an act or omission of a public employee was willful and wanton shall result in dismissal of the claim for failure to state a claim upon which relief can be granted."   Simply put, these Defendants argue that Plaintiff's Amended Complaint has not provided a sufficient factual basis to support his allegation that the alleged acts of Amedei and Cramer were of a willful and wanton nature.

The CGIA does not provide a definition for the phrase "willful and wanton," yet courts analyzing the CGIA's provisions have defined the term by reference to Colorado's exemplary damages statute, which describes such conduct as being "purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to the

consequences, or the rights and safety of others, particularly the plaintiff."   C.R.S. §

13-21-102(1)(b); *O'Hayre v. Bd. of Educ.*, 109 F.Supp.2d 1284, 1295 (D.Colo. 2000); *King v.*

*United States*, 53 F.Supp.2d 1056, 1073 (D.Colo. 1999); *Zerr v. Johnson*, 894 F.Supp. 372, 376

(D.Colo. 1995).

Taking the allegations in the Amended Complaint as true, and allowing all reasonable

inferences in Plaintiff's favor, the Court finds that Plaintiff has not sufficiently alleged a factual

basis to his contention that Amedei and Cramer's actions were of a willful and wanton nature.   As

described above in this Court's analysis of Plaintiff's claims against Amedei and Cramer under the

created danger doctrine, neither of these Defendants are alleged to have engaged in any affirmative

conduct.   For the same reason that Plaintiff's state created danger claim fails as against Amedei

and Cramer, so too does his claim against these Defendants for outrageous conduct.   Plaintiff's

claims against Amedei and Cramer are predicated on a lack of conduct, not on willful and wanton

conduct, and so his outrageous conduct claim is barred by operation of the CGIA.   C.R.S. §

24-10-110(5)(b).

### 2. State Claims against Adoption Alliance, Tem and Little

Title 28 U.S.C. § 1367(a) grants supplemental or pendent jurisdiction to federal district

courts over a plaintiff's state law claims which arise as "part of the same case or controversy" as

the federal claims on which original jurisdiction is based.   Interpreting this rule, the Tenth Circuit

has found that "[j]udicial economy and fairness result from retaining jurisdiction over mixed state

and federal claims where 'The state and federal claims . . . derive from a common nucleus of

operative fact.'"   *Estate of Harshman v. Jackson Hole Mtn. Resort Corp.*, 379 F.3d 1161, 1165

(10th Cir. 2004) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)).   A district court has discretion to decline to exercise supplemental jurisdiction over a state law claim if the "district court has dismissed all claims over which it has original jurisdiction."   28 U.S.C. § 1367(c)(3).   *See also Smith v. City of Enid ex rel. Enid City Comm'n*, 149 F.3d 1151, 1156 (10th Cir. 1998) ("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims.").

As described above, all Federal claims against Adoption Alliance, Tem, and Little are dismissed, but certain of the Federal claims pled against Amedei and Cramer remain before the Court.   However, the Court concludes that there is significant overlap between the facts underlying the state law claims against Adoption Alliance, Tem, and Little and the remaining claims against Amedei and Cramer such that they could be thought to involve "part of the same case or controversy."   28 U.S.C. § 1367(a).   The state law claims against Adoption Alliance, Tem and Little all would at least require proof of the same conduct by Plaintiff and Lovato during the same time period at issue as those claims against Amedei and Cramer.   Because the constellation of facts necessary to prove claims against Amedei and Cramer would be in large part identical to those facts necessary to prove claims against Adoption Alliance, Tem and Little, this Court will maintain pendant jurisdiction over the state law claims against all Defendants, as all of these claims "derive from a common nucleus of operative fact."   *Estate of Harshman*, 379 F.3d at 1165.

## IV.   CONCLUSION

Based on the foregoing, it is ORDERED that:

44

1. Plaintiff's objections to the Recommendation (ECF No. 267) are OVERRULED, in part, SUSTAINED, in part;

2. The Recommendation of the United States Magistrate Judge (ECF No. 259) is APPROVED AND ADOPTED, in part, REJECTED, in part;

3. Defendants Adoption Alliance and Melanie Tem's Motion to Dismiss Amended Complaint (ECF No. 213) is GRANTED, in part, DENIED, in part, to wit, the Court

    a. GRANTS the motion to the extent it seeks the dismissal of all claims against Adoption Alliance and Melanie Tem stated under 28 U.S.C.§ 1983; and

    b. DENIES the motion to the extent is seeks the dismissal of Plaintiff's state law claims against Adoption Alliance and Melanie Tem.

4. Defendant Vicki Little's Motion to Dismiss Amended Complaint (ECF No. 215) is GRANTED, in part, DENIED, in part, to wit, the Court

    a. GRANTS the motion to the extent it seeks the dismissal of all claims against Vicki Little stated under 28 U.S.C.§ 1983; and

    b. DENIES the motion to the extent is seeks the dismissal of Plaintiff's state law claims against Vicki Little.

5. The Motion to Dismiss Amended Complaint from Defendants Amedei and Cramer (ECF No. 216) is GRANTED, in part, DENIED, in part, to wit, the Court

    a. GRANTS the motion to the extent it seeks the dismissal of Plaintiff's claim under 28 U.S.C. § 1983 under the state created danger doctrine, the dismissal of Plaintiff's claim under 28 U.S.C. § 1983 for failure to train or supervise, the dismissal of Plaintiff's state law causes of

action; and Plaintiff's claims against Amedei and Cramer in their official capacities; and

b. DENIES the motion to the extent it seeks the dismissal of Plaintiff's claim under 28

U.S.C. § 1983 under the special relationship doctrine directed against Amedei and Cramer in

their individual capacities.

The claims remaining in this action are as follows: state law causes of action for

negligence and outrageous conduct against Melanie Tem, Vicki Little and Adoption Alliance and

28 U.S.C. § 1983 claims against Amedei and Cramer in their individual capacities under the

special relationship doctrine.

Dated this 17th day of February, 2016

BY THE COURT:

RAYMOND P. MOORE
United States District Judge